# 24-0227-cv

## United States Court of Appeals
### *for the*
### Second Circuit

---

CITGO PETROLEUM CORPORATION,

*Plaintiff-Appellee,*

— v. —

ASCOT UNDERWRITING LIMITED, for and on behalf of Lloyd's Syndicate 1414, PIONEER UNDERWRITING LIMITED, for and on behalf of Syndicate 9146, MS AMLIN UNDERWRITING LIMITED, for and on behalf of Lloyd's Syndicate 2001, TRAVELERS SYNDICATE MANAGEMENT LIMITED, for and on behalf of Lloyd's Syndicate 5000, BRIT SYNDICATES LIMITED, for and on behalf of Lloyd's Syndicate 2987, SOMPO INTERNATIONAL INSURANCE, for and on behalf of Lloyd's Syndicate 5151, CHAUCER SYNDICATES LIMITED, for and on behalf of Lloyd's Syndicate 1084, MARKEL SYNDICATE MANAGEMENT LIMITED, for and on behalf of Lloyd's Syndicate 3000, NEON UNDERWRITING LIMITED, for and on behalf of Lloyd's Syndicate 2468, STARSTONE INSURANCE SE,

*Defendants-Appellants,*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PAGE PROOF BRIEF FOR DEFENDANTS-APPELLANTS

JOHN M. WOODS
CLYDE & CO US LLP
*Attorneys for Defendants-Appellants*
The Chrysler Building
405 Lexington Avenue, 16th Floor
New York, New York 10174
(212) 710-3900

CP COUNSEL PRESS    (800) 4-APPEAL • (328656)

## CORPORATE DISCLOSURE STATEMENT

Defendants-Appellants Ascot Underwriting Limited (for and on behalf of the members of Lloyd's Syndicate 1414), Pioneer Underwriting Limited (for and on behalf of the members of Lloyd's Consortium No. 9146), MS Amlin Underwriting Limited (for and on behalf of the members of Lloyd's Syndicate 2001), Travelers Syndicate Management Limited (for and on behalf of the members of Lloyd's Syndicate 5000), Brit Syndicates Limited (for and on behalf of the members of Lloyd's Syndicate 2987), Sompo International Insurance (for and on behalf of the members of Lloyd's Syndicate 5151), Chaucer Syndicates Limited (for and on behalf of the members of Lloyd's Syndicate 1084), Markel Syndicate Management Limited (for and on behalf of the members of Lloyd's Syndicate 3000), Neon Underwriting Limited (for and on behalf of the members of Lloyd's Syndicate 2468), and Starstone Insurance SE (collectively, "Defendants-Appellants"), by and through their attorneys, Clyde & Co US LLP, pursuant to Federal Rules of Appellate Procedure 26.1 and 28(a)(1), state the following are parent corporations and publicly held corporations that own 10% or more of the stock of Defendants-Appellants:

1. Syndicate 1414 is an unincorporated association, the managing agent of which is Ascot Underwriting Limited. The sole corporate member of Syndicate 1414 is Ascot Corporate Name Limited. Ascot Corporate Name Limited and Ascot Underwriting Limited are ultimately wholly owned subsidiaries of Ascot Underwriting Holdings Ltd.

2. Consortium No. 9146 is an unincorporated association, the managing agent of which is Pioneer Underwriting Limited, and which is comprised of Lloyd's Syndicate 1980 and Lloyd's Syndicate 2088. The sole corporate member of Syndicate 1980 is Liberty Corporate Capital Limited. The sole corporate member of Syndicate 2088 is China Re UK Limited. Liberty International Holdings Inc. is the immediate corporate parent of Liberty Corporate Capital Limited, and their ultimate parent corporation is Liberty Mutual Holding Company Inc. No publicly held corporations own 10% or more of the stock of Pioneer Underwriting Limited, Liberty Corporate Capital Limited or China Re UK Limited.

ii

3.  Syndicate 2001 is an unincorporated association, the managing agent of which is MS Amlin Underwriting Limited. The sole corporate member of Syndicate 2001 is MS Amlin Corporate Member Limited. MS Amlin Corporate Member Limited and MS Amlin Underwriting Limited are ultimately wholly owned subsidiaries of MS Amlin plc, which is a wholly owned subsidiary of Mitsui Sumitomo Insurance Company, Limited, which is wholly owned by MS&AD Insurance Group Holdings, Inc., which is incorporated in Japan and listed on public stock exchanges.

4.  Syndicate 5000 is an unincorporated association, the managing agent of which is Travelers Syndicate Management Limited. The sole corporate members of Syndicate 5000 are AprilGrange UK Ltd and F&G UK Underwriters Ltd., which are wholly owned subsidiaries of The Travelers Companies, Inc., a publicly held corporation.

5.  Syndicate 2987 is an unincorporated association, the managing agent of which is Brit Syndicates Limited. The sole corporate member of Syndicate 2987 is Brit UW Limited. Brit UW Limited and Brit Syndicates Limited are indirect wholly owned

iii

subsidiaries of Brit Limited. Fairfax Financial Holdings Limited, a publicly held corporation, owns more than 10% of Brit Limited.

6. Syndicate 5151 is an unincorporated association, the managing agent of which is Sompo International Insurance. The sole corporate member of Syndicate 5151 is Endurance Corporate Capital Limited. Endurance Corporate Capital Limited is a wholly owned subsidiary of Endurance Holdings Limited.

7. Syndicate 1084 is an unincorporated association, the managing agent of which is Chaucer Syndicates Limited. The sole corporate member of Syndicate 1084 is Chaucer Corporate Capital (No. 3) Limited. Chaucer Corporate Capital (No. 3) is a wholly owned subsidiary of Chaucer Holdings, and their ultimate corporate parent is The Hanover Insurance Group Inc., a publicly held company.

8. Syndicate 3000 is an unincorporated association, the managing agent of which is Markel Syndicate Management Limited. The sole corporate member of Syndicate 3000 is Markel Capital Limited. Markel Capital Limited and Markel Syndicate

iv

Management Limited are wholly owned subsidiaries of Markel Corporation, a publicly held company.

9. Syndicate 2468 is an unincorporated association, the managing agent of which is Neon Underwriting Limited. The sole corporate members of Syndicate 2468 are Lavenham Underwriting Limited, Sampford Underwriting Limited and GAI Indemnity, Ltd. Lavenham Underwriting Limited, Sampford Underwriting Limited and Neon Underwriting Limited are wholly owned subsidiaries of Neon Capital Limited. GAI Indemnity, Ltd. and Neon Capital Limited are wholly owned subsidiaries of GAI Holding Bermuda Ltd.

10. Starstone Insurance SE is a Liechtensteiner corporation and is wholly owned by StarStone Bermuda Ltd., and their ultimate parent company is Enstar Group Limited, a publicly held company.

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................ix

JURISDICTIONAL STATEMENT ............................................................1

STATEMENT OF THE ISSUES ................................................................3

STATEMENT OF THE CASE ...................................................................7

  A.   Facts Relevant to the Issues Submitted for Review .....................7

  B.   Relevant Procedural History and Rulings Presented for Review 11

SUMMARY OF THE ARGUMENT .........................................................18

ARGUMENT ...........................................................................................21

  I.    THE DISTRICT COURT'S SUMMARY JUDGMENT OPINION
     AND ORDER IS INCORRECT ...........................................................21

   A.   CITGO Was Not Entitled to Summary Judgment on the Issue
    of Whether There Was an Insurrection .............................................21

     1.   The District Court Erred as a Matter of Law in Drawing
     Factual Inferences in Favor of CITGO and Against Reinsurers.21

     2.   The District Court Erred as a Matter of Law in Determining
     that the Policy Is Ambiguous ......................................................22

   B.   Reinsurers Are Entitled to Summary Judgment on the Issue of
    Whether There Was an Insurrection .................................................25

     1.   The District Court Erred as a Matter of Law in Determining
     that the Wording Used to Define "Insurrection" in Controlling
     War Risk Insurance Coverage Case Law Is Ambiguous..............25

     2.   The District Court Erred as a Matter of Law in Finding that
     the Maduro Government Was an "Insurrection" .........................26

     3.   The District Court Erred as a Matter of Law in Finding that
     Juan Guaidó Led a "Constituted Government" that Could be

"Overthrown" by "Insurrection" Notwithstanding Its Lack of any Governmental Powers to be Seized ................................................. 32

    a.   The District Court Erred as a Matter of Law by Concluding that the Controlling War Risk Insurance Coverage Case Law "Contain[s] No Requirement that a Government Hold *De Facto* Power for It To Be Insurrected Against." ......... 33

    b.   The District Court's decision on Summary Judgment was Internally and Fatally Inconsistent. ......................................... 36

    c.   The District Court Erred as a Matter of Law in Concluding that the Recognition of Juan Guaidó as President of Venezuela by the United States is at all Relevant ............... 37

    d.   The District Court Erred in Determining, As a Matter of Foreign Law Under Federal Rule of Civil Procedure 44.1, that Juan Guaidó Became Venezuela's Interim President in Accordance with the Provisions of the Venezuelan Constitution Related to Vacancies No Later than January 10, 2019 ............ 39

       i.   There is no Basis to Conclude that Nicolás Maduro Abandoned the Venezuelan Presidency. ............................... 40

       ii.  The Guaidó Government Never Had a Legal or Constitutional Basis Under Venezuelan Law ....................... 48

    4.   The District Court Erred as a Matter of Law by Failing to Apply the Clear and Unambiguous Definition of "Insurrection" Set Forth in the Controlling War Risk Insurance Coverage Case Law to the Undisputed Facts of the Case and to Grant Reinsurers' Motion fr Summary Judgment ................................. 52

II.   THE DISTRICT COURT ABUSED ITS DISCRETION IN TAKING JUDICIAL NOTICE OF FACTS THAT WERE CONTROVERTED AND NOT RELEVANT ........................................ 55

  A.   The District Court Inappropriately Noticed Facts in Dispute. 55

B.      The District Court Noticed Facts That Were Not Relevant to the Issues ............................................................................... 58

C.      The Judicially Noticed Facts Were Not Appropriate Because They Are Not from Sources Whose Accuracy Cannot Reasonably Be Questioned ............................................................................ 59

     1.      State Department Country Reports ..................................... 59

     2.      Congressional Research Service Report ............................. 61

     3.      U.N. Reports ........................................................................ 61

III.    THE COURT'S JURY INSTRUCTION ON CAUSATION WAS LEGALLY INCORRECT FOR THIS WAR RISK INSURANCE COVERAGE DISPUTE ............................................................... 62

CONCLUSION ............................................................................... 69

CERTIFICATE OF COMPLIANCE ..................................................... 71

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Alvary v. United States,*
302 F.2d 790 (2d Cir. 1962) ...................................................................55

*Bird v. St. Paul Fire & Marine Insurance Co.*
224 N.Y. 47, 120 N.E. 86 (1918) .....................................................63, 64

*Brown v. Piper,*
91 U.S. 37 (1875) .................................................................................56

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) .............................................................................52

*Ellis v. Jackson,*
319 F. Supp. 3d 23 (D.D.C. 2018) .......................................................58

*Great Lakes Insurance v. Raiders Retreat Realty Co.,*
601 U.S. 65 (2024) ...............................................................................67

*Holiday Inns v. Aetna Insurance Co.,*
571 F.Supp. 1460 (S.D.N.Y. 1983).........................................31, 35, 54

*Home Ins. Co. v. Davila,*
212 F.2d 731 (1st Cir. 1954) .......................................................*passim*

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.,*
146 F.3d 66 (2d Cir. 1998) ..................................................................56

*Luigi Monta of Genoa v. Cechofracht Co Ltd*
[1956] 2 Q.B. 552................................................................................39

*Maroney v. N.Y. Cent. Mut. Fire Ins. Co.,*

5 N.Y.3d 467 (2005)..................................................................65

*Niam v. Ashcroft,*
354 F.3d 652 (7th Cir. 2004)..............................................60

*Oetjen v. Central Leather Co.,*
246 U.S. 297 (1918)............................................................50

*Oneida Indian Nation of New York v. State of N.Y.,*
691 F.2d 1070 (2d Cir. 1982). ..........................................55

*Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.,*
368 F.Supp. 1098 (S.D.N.Y. 1973), aff'd 505 F.2d 989
(2d Cir. 1974)...............................................................*passim*

*Queen Insurance Co. v. Globe & Rutgers Fire Insurance Co.,*
263 U.S. 487 (1924) .....................................................63, 64

*Slate v. Am. Broad. Cos.,*
12 F.Supp.3d 30 (D.D.C. 2013) .........................................58

*United States v. Belmont,*
301 U.S. 324 (1937)............................................................50

*White, Child and Beney v. Simmons and Eagle Star*
(1922) 11 Ll. L. Rep. 7........................................................39

## STATUTES

28 U.S.C. § 1291.....................................................................1
28 U.S.C. § 1294.....................................................................1
28 U.S.C. § 1332.....................................................................1

## OTHER AUTHORITIES

8 C.F.R. § 208.13...................................................................60
Constitution of Venezuela, Article 233.........................*passim*

Executive Order 13857 ...................................................................... 7, 68

Merriam-Webster, Merriam-Webster.com (last visited May 14, 2024).....

............................................................................. ............33, 35

Oxford English Dictionary, oed.com (last visited May 14, 2024) .........33

## RULES

Fed. R. Civ. P. 56 ........................................................................52

Fed. R. Evid. 201...........................................................................55

Fed. R. Evid. 403.............................................................................6

# JURISDICTIONAL STATEMENT

The District Court's subject matter jurisdiction was based on diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2). This Court's jurisdiction is based on 28 U.S.C. § 1291 and 28 U.S.C. § 1294(1). *See* ECF Docket ("Dkt.") 58, Second Amended Complaint ¶¶ 7, 8; Dkt. 61, Answer ¶¶ 7, 8.

This is an appeal from the District Court's Judgment, (1) from the Opinion and Order dated March 15, 2023 (Dkt.182) denying Defendants' motion for summary judgment (Dkt. 136-142, 144-148, 156-157, 173-175, 178-179), granting in part Plaintiff's motion for partial summary judgment (Dkt. 123-133, 149-151, 153-154, 170-172, 176-177) and granting in part Plaintiff's first motion to take judicial notice (Dkt. 134-135, 152, 155); (2) from the Order dated November 10, 2023 (Dkt. 238) granting in part Plaintiff's second motion to take judicial notice (Dkt. 207-208, 218, 222); (3) from the Order dated November 14, 2023 (Dkt. 239) and the Court's further rulings at trial determining in Plaintiff's favor factual issues in respect of whether and when Juan Guaidó was President of Venezuela; (4) from the Court's ruling at trial permitting Plaintiffs to publish to the jury judicially noticed facts; (5) from the

Court's adoption of Plaintiff's instructions to the jury and refusals to instruct the jury as requested by Defendants; and (6) from the final Judgment entered in this action on December 28, 2023 against Defendants and in favor of Plaintiff CITGO Petroleum Corporation (Dkt. 290).

Defendants-Appellants timely filed their notice of appeal on January 25, 2024. The appeal is from a final order and judgment that disposes of all parties' claims.

**Oral argument is requested.**

## STATEMENT OF THE ISSUES

1.     Whether the District Court erred as a matter of law in drawing factual inferences in favor of Plaintiff-Appellee CITGO and against Defendants-Appellants ("Reinsurers") in connection with the District Court's Order and Opinion granting in part CITGO's motion for partial summary judgment by finding that an "insurrection" occurred in Venezuela "after January 2019." The standard of review is *de novo* for this issue.

2.     Whether the District Court erred as a matter of law in determining that the Policy at issue in this dispute is ambiguous. The standard of review is *de novo* for this issue.

3.     Whether the District Court erred as a matter of law in determining that the words used to define "insurrection" in controlling war risk insurance coverage case law – specifically "uprising" and "overthrow" – are ambiguous. The standard of review is *de novo* for this issue.

4.     Whether the District Court erred as a matter of law in finding that actions taken by the Maduro regime to consolidate and/or to retain governmental powers already within the control of the Maduro regime

were or possibly could have been done with the intent required to make those actions an insurrection. The standard of review is *de novo* for this issue.

5. Whether the District Court erred as a matter of law in finding that the "government" led by Juan Guaidó was or possibly could be the target of an insurrection notwithstanding its lack of any actual governmental powers to be seized. The standard of review is *de novo* for this issue.

6. Whether the District Court erred as a matter of law by concluding that the controlling war risk insurance coverage case law "contain[s] no requirement that a government hold *de facto* power for it to be insurrected against." The standard of review is *de novo* for this issue.

7. Whether the District Court erred as a matter of law in concluding that there is a "recognition doctrine" under U.S. law that rendered Juan Guaidó President of Venezuela by the United States government and conferred on him "powers" capable of being seized by "insurrection." The standard of review is *de novo* for this issue.

4

8. Whether the District Court erred as a matter of law by failing to apply the clear and unambiguous definition of "insurrection" set forth in the controlling war risk insurance coverage case law to the undisputed facts of this case in denying Reinsurers' motion for summary judgment. The standard of review is *de novo* for this issue.

9. Whether the District Court erred in determining, as a matter of foreign law under Federal Rule of Civil Procedure 44.1, that Juan Guaidó became Venezuela's interim president no later than January 10, 2019 in accordance with the provisions of the Venezuelan Constitution, and specifically Article 233. The standard of review is *de novo* for this issue.

10. Whether the District Court erred in determining, as a matter of foreign law under Federal Rule of Civil Procedure 44.1, that Nicolás Maduro abandoned the Venezuelan presidency. The standard of review is *de novo* for this issue.

11. Whether the District Court erred in determining, as a matter of foreign law under Federal Rule of Civil Procedure 44.1, that the purported appointment by the Venezuelan National Assembly of Juan Guaidó as Interim President of Venezuela was done in accordance with

5

the provisions of the Venezuelan Constitution. The standard of review is *de novo* for this issue.

12. Whether the District Court erred in determining certain facts as a matter of judicial notice under Federal Rule of Evidence 201, including without limitation that "[o]n January 23, 2019, Juan Guaidó, as president of the National Assembly, assumed the role of interim president pursuant to the provisions of the [Venezuelan] constitution related to vacancies." The standard of review is abuse of discretion for this issue.

13. Whether the District Court erred in concluding that the relevance of certain judicially noticed and published facts to issues to be decided by the jury were not substantially outweighed by their prejudicial effect under Federal Rule of Evidence 403. The standard of review is abuse of discretion for this issue.

14. Whether the District Court erred as a matter of law in instructing the jury on the applicable causation standard under New York law in this war risk insurance coverage dispute. The standard of review is *de novo* for this issue.

## STATEMENT OF THE CASE

### A. <u>Facts Relevant to the Issues Submitted for Review</u>

This case is a war risk insurance coverage dispute. Plaintiff-Appellee CITGO Petroleum Corporation ("CITGO" or "Plaintiff") is the Original Insured under a Marine Cargo Reinsurance Policy (the "Policy") issued by the Reinsurers. Dkt. 75-1, 75-2. CITGO's claim is for loss of a cargo of crude oil loaded in Venezuela aboard CITGO's chartered tanker (the "Vessel"). The cargo was supplied to CITGO by Petróleos de Venezuela, S.A. ("PDVSA"), Venezuela's state oil company and CITGO's ultimate corporate parent, pursuant to a 2016 sales contract between CITGO and PDVSA. Dkt. 139-1.

Pursuant to that contract, the loading of the cargo to the Vessel was in progress on January 25, 2019, when the U.S. government extended its Venezuela sanctions to PDVSA. Dkt. 58, p.9. This was done by Executive Order 13857, promulgated by then-President Trump, which expressly declared that the term "Government of Venezuela" includes PDVSA. Dkt. 139-2. The extension of U.S. sanctions to PDVSA prevented all transactions with PDVSA, including payments – whether in U.S. currency or in kind – for the export of petroleum. *Id.*. Accordingly, the

imposition of U.S. sanctions upon PDVSA made it impossible for the CITGO-PDVSA transaction then in progress – the purchase and sale of the crude oil cargo – to be completed. Dkt. 141, ¶20.

Recognizing this impossibility, PDVSA and CITGO agreed that the sale and purchase of the cargo at issue in this case would need to be cancelled. Dkt. 139-10 (PDVSA asking CITGO "to cancel the load" and return cargo to PDVSA). For several weeks, CITGO pursued arrangements for the cargo to be discharged from the Vessel to another tanker to be nominated by PDVSA. *Id.*; Dkt. 139-11, 139-12, 139-13, 139-14. The reason CITGO agreed to return nearly a million barrels of crude oil was simple: CITGO had not paid for the cargo when the sanctions were imposed on PDVSA and it could not pay for it thereafter. Dkt. 139-2.

However, on February 23, 2019, CITGO abruptly changed its position, and began insisting that it could offset the purchase price of the oil against amounts due from PDVSA for other transactions. Dkt. 139-15, 139-16, 139-18, 139-19. PDVSA did not accept the offsets claim, and insisted on the return of the oil. *Id.*; Dkt. 139-20,139-21. Because PDVSA was unwilling to let the ship sail out of Venezuela without receiving

payment for the crude oil, a standoff then ensued, during which the Vessel was not given clearance to depart Venezuelan waters, while CITGO refused PDVSA's demands to return the crude oil cargo. *Id.* The standoff lasted over a year and was resolved only after PDVSA obtained a Venezuelan Court's judgment in its favor. The resulting Court Order, dated December 17, 2019, which ordered the "restitution" of the cargo to PDVSA, was served upon the Vessel on December 22, 2019. Defs.' Exh. RR; Dkt. 139-25; Dkt 142-3, 142-4. In compliance with that Court Order, the Vessel sailed to Puerto Jose, Venezuela and discharged the cargo to PDVSA's shore tanks in February 2020. Dkt. 139-27.

The resulting insurance claim by CITGO upon the Policy is a war risk insurance claim because CITGO's sole coverage theory is that it suffered a loss of the cargo caused by "seizure" arising from "insurrection" as those terms are used in the Policy's limited war risk coverage (contained in the "Institute War Clauses"). Dkt. 58, pp.22-23. The parties, and the Court below, agree that the governing definition of "insurrection" for this war risk insurance coverage dispute was established by this Court a half-century ago. Dkt. 182, p.17. Insurrection is "(1) a violent uprising by a group or movement (2) acting for the specific purpose of

overthrowing the constituted government and seizing its powers." *Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 368 F.Supp. 1098, 1124 (S.D.N.Y. 1973), *aff'd* 505 F.2d 989, 1017 (2d Cir. 1974). Because there was no "violent uprising" in Venezuela at any relevant time, let alone a violent uprising "for the specific purpose of overthrowing the constituted government and seizing its powers," or that bore any causal or other relationship to the removal of the cargo from CITGO's Vessel – which arose not from any war risk or other violence but from an inability to remit payment for the cargo due to U.S. sanctions – there is no coverage under the Policy for CITGO's claim.

**B.** <u>Relevant Procedural History and Rulings Presented for Review</u>

On March 14, 2022, Reinsurers filed a motion for summary judgment and CITGO filed a motion for partial summary judgment and a (first) motion to take judicial notice of certain alleged facts. Dkt. 123, 134, 136. These motions were fully briefed and submitted to the District Court (Judge Gregory H. Woods) on April 27, 2022. Dkt. 123-142, 144-157. On November 23, 2022 the District Court *sua sponte* ordered the parties to file "additional briefing on the historical interpretation of insurrection clauses in insurance contracts." Dkt. 167. The parties simultaneously filed principal submissions in response to this Order on January 13, 2023 (Dkt. 170-175) and replies on January 27, 2023. Dkt. 176-179. Because the specific Institute War Clauses in the Policy at issue in this case have their origins in English marine insurance law and practice, both CITGO and Reinsurers filed declarations of English barristers, each of whom is a King's Counsel with experience in the law of marine insurance. Dkt. 171-172; Dkt.175. Each of those English barristers described the evolution of insurrection clauses in marine and war risk insurance contracts, as well as the construction of those clauses in case law over the course of more than a hundred years. *Id.*

11

In its motion for judicial notice of certain facts, CITGO requested that the District Court judicially notice a statement of U.S. President Donald Trump, recognizing Juan Guaidó as interim president, and a press statement of then-U.S. Secretary of State Michael Pompeo, in which Secretary Pompeo recognized Guaidó and stated Maduro did not have 'legal authority' as president. Dkt. 135, p. 3.

On March 15, 2023, the District Court denied Reinsurers' motion for summary judgment, granted in part and denied in part CITGO's motion for partial summary judgment and granted in part and denied in part CITGO's first motion to take judicial notice. Dkt.182. In its opinion in respect of its decisions on these motions, the District Court expressed the view that "an ordinary person could read the *Pan Am* definition [of "insurrection"] and reasonably agree with either party about whether an insurrection occurred in Venezuela after January 2019." *Id.* p.21. In granting in part CITGO's motion for summary judgment, the District Court thus erroneously drew all factual inferences in favor of CITGO and against Reinsurers in finding that an insurrection occurred in Venezuela "after January 2019." *Id.* p.16. The District Court's basis for reaching its result was a finding of "ambiguity" in the Policy, but the words the Court

identifies as ambiguous – "uprising" and "overthrow" – do not actually appear in the Policy. *Id.* p.25. The District Court did not cite any language that is used in the Policy as ambiguous, let alone explain how any Policy wording (or any other wording) is in fact ambiguous.

The District Court further found that the insurrection was one by the Maduro regime, which at all relevant times has had exclusive control of all governmental powers in Venezuela, directed against a "government" led by Juan Guaidó with no such governmental powers. *Id.* p.26. The District Court reached this conclusion despite admitting that there is not a single example of an "insurrection," whether in case law or in history generally, against a purported "government" that lacks governmental powers to be seized. *Id.* p.22. Despite the abundant clarity of what the District Court (and the parties) agreed is the governing definition of "insurrection," namely, that an insurrection involves "seizing" governmental powers, the District Court erroneously identified the main issue presented by the parties' summary judgment motions as whether "consolidat[ing] power" or "retain[ing] power" already within the control of the supposedly insurrectionary party can constitute insurrection. *Id.* pp.1-3.

13

The District Court also drew factual inferences in favor of CITGO and against Reinsurers even though such factual inferences were incorrect or at the very least not supported by any record evidence, including the District Court's erroneous conclusions: (1) that recognition by U.S. and other foreign governments directed to the Juan Guaidó "government" somehow conferred or could be equated with actual governmental power in Venezuela and (2) that the Maduro regime acted with intent "to take control of Venezuela's governmental institutions" despite already having such control over all such governmental institutions at all relevant times. *Id.* pp.18, 20, 26 n.6.

In ruling on the motion, the District Court recognized that "the truth of statements concerning geopolitical conflict, without evidence definitively proving the indisputability of the given assertions, is generally an inappropriate subject for judicial notice," and that "many of the underlying facts and positions taken in the Trump and Pompeo statements are subject to dispute." *Id.* p.13. Nevertheless, despite these evidentiary issues, the District Court granted CITGO's motion in part, taking judicial notice of these statements "for the purpose of identifying

14

the United States Government's position on the *legitimate* government of Venezuela." *Id.* p. 14 (emphasis added).

Additionally, the District Court judicially noticed "facts" from United States State Department Country Reports, a Congressional Research Service Report, and United Nations Reports, concerning the Maduro regime's repressive acts against those critical of the regime, and against Guaidó supporters and journalists, as well as the National Assembly's vote to "reelect" Juan Guaidó interim president of Venezuela. *See id.* p.15; *see also* Dkt. 135. While the District Court explained that as a general principle, these are the types of sources "whose accuracy cannot reasonably be questioned," statements that appear in government documents must still meet the "high degree of indisputability" required by Rule 201. Dkt. 182, p.14. In granting judicial notice of these facts, the District Court held that they were not subject to reasonable dispute.

On September 19, 2023, CITGO filed a second motion for judicial notice, which was fully briefed and submitted on October 5, 2023. Dkt. 207-208; 218, 222. In its motion, CITGO requested that the District Court take judicial notice of revised facts which the District Court declined to notice from CITGO's first motion for judicial notice. Dkt. 238,

15

p.1. CITGO revised these facts by omitting the elements identified by the District Court as opinions and removing any of its added paraphrasing. Again, the District Court recognized that generally, the truth of statements concerning geopolitical context is "an inappropriate subject for judicial notice," and facts may not be judicially noticed unless they meet the "high degree of indisputability" required by Rule 201. *Id.* p.2.

Nonetheless, the District Court granted in part and denied in part CITGO's second motion for judicial notice on November 10, 2023. Dkt. 238. In so holding, the District Court took judicial notice of certain alleged "facts," which were clearly in dispute, including without limitation that "[o]n January 23, 2019, Juan Guaidó, as president of the National Assembly, assumed the role of interim president pursuant to the provisions of the [Venezuelan] constitution related to vacancies." Dkt. 238, p.3; *see* Dkt. 208-1.

On December 12, 2023, the day the trial of this action began, the District Court determined that the supposed Venezuelan presidency of Juan Guaidó began no later than January 10, 2019. Trial Transcript (Tr.), Dec. 12, 2023, 31:20-23. This erroneous determination was made part of the jury instructions, notwithstanding that it is inconsistent with

16

the District Court's earlier judicially noticed "fact" that Guaidó "assumed the role of interim president" on January 23, 2019. Trial Tr., Dec. 18, 2023, 872:2-6. Thereafter, pursuant to the District Court's Order related to CITGO's partial summary-judgment motion (Dkt. 182) and its judicial notice of certain facts raised in CITGO's second motion (Dkt. 238), the District Court permitted this and other judicially noticed facts to be published to the jury even though their accuracy was in dispute, and their relevance to any issue to be decided by the jury was far outweighed by their prejudicial nature. Trial Tr. Dec. 14, 2023, 397:2-398:9; 544:2-547:2; Dec. 18, 2023, 852:22-853:3.

Reinsurers timely filed their notice of appeal on January 25, 2024. Dkt. 294.

## SUMMARY OF THE ARGUMENT

The District Court erroneously drew factual inferences in favor of CITGO on CITGO's motion for summary judgment, finding as a factual matter that there had been an "insurrection" in Venezuela despite the lack of record evidence to support it. The District Court's only basis for drawing factual inferences against Reinsurers was its erroneous finding of "ambiguity" in the parties' insurance contract. As the District Court itself later admitted, it did ***not*** find any ambiguity in that contract. The District Court instead labeled "ambiguous" ***this Court's*** long-established and ***un***ambiguous definition of "insurrection," a definition which the District Court simply failed to understand and apply to the facts of this case. Proper application of what the parties agree is the controlling "insurrection" definition leads to but one conclusion: there was no insurrection, and Reinsurers are entitled to summary judgment.

CITGO's backward theory of its "insurrection" case is that Nicolás Maduro – the President of Venezuela and head of its government since 2013 – did not control the government at all, but instead became an "uprising" against a supposed "government" of opposition leader Juan Guaidó. But the Guaidó faction never had any governmental power – all

18

of that power was already controlled by Maduro such that Maduro could not have "seized" it. Neither was a supposed Guaidó "government" ever "lawfully constituted" under the Venezuelan Constitution. The Guaidó faction was never a government, whether in law or in fact, i.e., a "lawfully constituted regime." It thus clearly fails this Court's test for what may be the target of an "insurrection."

Nevertheless, the District Court inexplicably read the words "seizing its powers" out of this Court's controlling "insurrection" definition and ignored Venezuelan legal briefing and affidavits that showed conclusively the Guaidó faction was never "lawful" either. That is because the legal basis for the Guaidó "government" depends entirely on Maduro having "abandoned" the Venezuelan presidency – and all the evidence shows Maduro did precisely the opposite. Mere "recognition" of Guaidó in statements by U.S. government officials cannot have made the powerless Guaidó faction a "government" either as a matter of objective fact or of *Venezuelan* law, and so is irrelevant to this war risk coverage dispute under a private law insurance contract.

The District Court's decision to treat the demonstrably incorrect assertion that "[o]n January 23, 2019, Juan Guaidó . . . assumed the role

19

of interim president pursuant to the provisions of the constitution related to vacancies" as a "fact" of which judicial notice may be taken and published to the jury as such was thus a clear abuse of discretion, completely failing to meet the high standard for judicial notice. Judicially noticed facts about non-insurrectionary violence in Venezuela were prejudicial and irrelevant to the causation issues to be decided by the jury. Other judicially noticed facts were wrongly characterized as beyond dispute, even though the sources relied upon for them were either not produced, were wrongly imputed to Reinsurers, were subject to political bias, or expressly applied a lower standard of proof.

The District Court ignored controlling New York law as to the causation standard that applies in a war risk insurance coverage case, and instead wrongly applied a causation standard based on a single case involving the application of a homeowner's liability insurance policy to a personal injury.

## ARGUMENT

## I. THE DISTRICT COURT'S SUMMARY JUDGMENT OPINION AND ORDER IS INCORRECT

### A. CITGO Was Not Entitled to Summary Judgment on the Issue of Whether There Was an Insurrection

#### 1. The District Court Erred as a Matter of Law in Drawing Factual Inferences in Favor of CITGO and Against Reinsurers

In ruling on *CITGO's* motion for summary judgment, the District Court was "required to resolve all ambiguities and draw all permissible factual inferences in favor of" *Reinsurers* as "the party against whom summary judgment is sought." Dkt. 182, p.11. Moreover, "[t]he Court's job is not to 'weigh the evidence or resolve issues of fact.'" *Id.* The District Court expressly acknowledged that an ordinary person reasonably could agree with Reinsurers about whether an insurrection occurred in Venezuela. *Id.* p.21. That acknowledgment alone should have caused the District Court to deny CITGO's motion.

Nevertheless, the District Court erroneously drew all factual inferences in *favor of CITGO* and *against Reinsurers* to find – as a matter of fact – that there *had* been an insurrection in Venezuela. The District Court made this factual finding despite the lack of record

21

evidence to support it. The District Court did not identify any particular event(s) that supposedly constituted the insurrection, and it then vaguely and confusingly ruled that the insurrection had begun "**after** January 2019." *Id.* p.26 (emphasis added) (The oil cargo completed loading on the Vessel on January 28, 2019, at which point it was not allowed to sail.). The District Court also incongruously found that whether an insurrection had occurred at an earlier time was a question of fact for the jury to decide, notwithstanding the fact that it had itself ruled on the occurrence of an insurrection "after January, 2019." Tr., Pretrial Conf. Nov. 1, 2023, 5:17-25.

## 2. The District Court Erred as a Matter of Law in Determining that the Policy Is Ambiguous

The District Court's ***only*** basis for construing the Policy against Reinsurers and taking from the jury the issue of whether an insurrection had occurred "after January 2019" is its finding of "ambiguity" in the term "insurrection." However, neither party argued that the term was ambiguous. On the contrary, the parties ***expressly agreed*** on the definition of insurrection to be applied in this case, which is "(1) a violent uprising by a group or movement (2) acting for the specific purpose of

22

overthrowing the constituted government and seizing its powers." Dkt. 182, p.17.

This governing definition of "insurrection" applicable in war risk insurance coverage cases (like this one) was established by this Court in its canonical war risk insurance coverage decision in *Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 368 F.Supp. 1098 at 1124 (S.D.N.Y. 1973), *aff'd*, 505 F.2d 989, 1017 (2d Cir. 1974) (citing *Home Ins. Co. v. Davila*, 212 F.2d 731 (1st Cir. 1954)). In that case, this Court did not find the term "insurrection" to be ambiguous at all. In fact, prior to the District Court's erroneous decision in this case, no court interpreting a war risk insurance policy had ever found the term "insurrection" (or any other term in this traditional war risk coverage) to be ambiguous.

Neither CITGO nor the District Court contends, let alone demonstrates, that the word "insurrection" as used in the ***Policy*** is ambiguous. In the absence of any ambiguity in the meanings of words as they are actually used in an insurance contract, ***derived from construction of the words themselves as used in the contract***, there can be no finding that the contract is ambiguous. Indeed, the District Court did not find ambiguity in the Policy based on its construction of the

23

Policy itself. *See* Dkt. 182 n.9 ("The Court had not determined that the contract was ambiguous at the time of its request.").

Rather, what the District Court labels "ambiguous" ***is the language used by this Court*** in *Pan Am* to define insurrection. As will be discussed below, the Court does not identify any actual ambiguity in the meanings of any of the words that comprise this Court's definition of insurrection. However, and critically, the District Court then makes a fundamental error, stating that the Court "… must read the ambiguous words in the Policy – 'uprising' and 'overthrow' – in a way that supports coverage." (Dkt. 182 p.25.) ***But the words "uprising" and "overthrow" are not found anywhere in the Policy.*** They are found only in this Court's *Pan Am* definition of insurrection. They are words that this Court has used to define the term "insurrection" and they are certainly not ambiguous words. The Court's finding of **Policy** ambiguity is therefore completely baseless. With no ambiguity in the Policy, the District Court's decision to construe the supposed ambiguities it found elsewhere against Reinsurers is a fundamental error that taints the entirety of the District Court's decision on the parties' summary judgment motions – but at the very least, requires reversal of the District Court's decision to grant

24

CITGO's motion on the issue of whether there was an insurrection in Venezuela.[1] *Id.* p.25.

## B. Reinsurers Are Entitled to Summary Judgment on the Issue of Whether There Was an Insurrection

### 1. The District Court Erred as a Matter of Law in Determining that the Wording Used to Define "Insurrection" in Controlling War Risk Insurance Coverage Case Law Is Ambiguous

The District Court's patently erroneous attribution of the words "uprising" and "overthrow" to the Policy (rather than the definition in *Pan Am* of the term "insurrection") only highlights the depth of the District Court's confusion between Policy wording and controlling authority. The District Court's opinion contains no analysis or explanation as to how these words – as used by this Court in defining "insurrection" – could be ambiguous. The District Court cited multiple definitions of "uprising" and "overthrow" but failed to point to any material difference in their respective meanings, or to any possible alternative meaning of "uprising" and "overthrow" ***to the definite and***

---

[1] At the November 15, 2023 pretrial conference, the District Court admitted this error, declaring, with reference to the Policy, "I'm not aware of the provision of the contract as to which I have made a threshold determination of its ambiguity such that evidence on that topic might be presented to the jury." (Tr., Pretrial Conf. Nov. 15, 2023 16:2-5.)

***precise meanings of these words as used by this Court***, particularly as this Court's definition is explicit that the "uprising" must be "for the specific purpose of overthrowing the constituted government and seizing its powers."

Recognizing that the *Pan Am* definition of insurrection "map[s] imperfectly" (Dkt. 182, p. 20) with the events taking place in Venezuela at the time, the District Court simply declared that it would be "perfectly sensible to view *Pan Am* as imposing no requirement that the constituted government exercise a minimum threshold of *de facto* power …." (Dkt. 182, pp. 20-21.) Of course, that is not sensible at all. Here it leads to the illogical conclusion that there could be a violent uprising against a government that exists in name only.

The problem in this case is not that either the Policy or this Court's war risk insurance coverage precedent in *Pan Am* is ambiguous, but that the District Court simply failed to understand and correctly apply the unambiguous definition of insurrection established by this Court in *Pan Am*. The District Court misinterprets as "ambiguity" what is in fact simply the inapplicability of "insurrection" to events in Venezuela.

## 2. The District Court Erred as a Matter of Law in Finding that the Maduro Government Was an "Insurrection"

26

The District Court repeatedly confirms that the Maduro government held all governmental power in Venezuela, without interruption, at all relevant times. *See* Dkt. 182, pp. 17, 19, 20 n.6. Accordingly, the Guaidó "government" was never possessed of any governmental power in Venezuela that the Maduro government could have seized. The District Court implicitly recognized this when it stated that the Maduro government acted to retain the governmental powers already within its control, and inexplicably accepted CITGO's position that "Maduro's refusal to yield" governmental power somehow can be equated to "seizing" governmental power. *See id.* pp.18, 21. Elsewhere the District Court inconsistently and erroneously concludes that Maduro intended "to take control of Venezuela's governmental institutions" – control which Maduro already had. *Id.*, p. 21 n.8.

The Maduro government could not have acted with the purpose of "seizing powers" – for the simple reason that there were no powers to be seized from the Guaidó faction that were not already within the Maduro government's control. The Maduro regime never stopped governing Venezuela; the Guaidó faction never started. Refusal to leave government is the very opposite of, and could not have been done with

27

the purpose of, "overthrowing" that government and seizing its powers. The Maduro regime cannot have been an "insurrection," successful or otherwise, because it never lost the governmental power that an insurrection seeks and that a successful insurrection obtains.

Even violence that is the result of an organized conspiracy overtly political in nature and clearly directed at the government is not insurrectionary if not directed to the specific purpose of overthrowing the government and seizing its powers. *See Home Ins. Co. of New York v. Davila*, 212 F.2d 731 (1st Cir. 1954). In *Davila*, the insured sought recovery under policies of fire insurance for damage to his buildings burned "as an incident of the uprising staged … by a little band of extremists calling themselves the Nationalist Party of Puerto Rico." 212 F.2d at 732. Among their reasons for disputing coverage, the insurers relied on a provision excluding fire losses "caused, directly or indirectly, by … Insurrection." *Id.*

The violent uprising in *Davila* was caused by a small but organized conspiracy of Puerto Rican Nationalists who opened fire upon the official gubernatorial residence, exchanged gunfire with and killed at least three police officers and burned government buildings and private property. *Id.*

28

at 734. The Nationalists took physical control of at least one town for several hours, causing most of its citizens to flee, "paralyz[ing]" its "regularly constituted authority" and raising their Nationalist flag. *Id.*

Notwithstanding the extent of the Nationalists' violence, however, the Court of Appeals stated that "[w]hether it was an 'insurrection' or not depended upon what was in their minds as the objective, or objectives, of the uprising." *Id.* at 737-38. After reviewing the facts and testimony of some of the Nationalists involved in planning the uprising, which described plans to install a Nationalist government in place of the U.S. government, the Court of Appeals considered that the Nationalists may have had, as a "maximum objective … the overthrow of the insular government." *Id.* at 738. Alternatively, the Court also considered that the Nationalists' violence, though political both in motivation and expression, may have had a "lesser" or "minimum objective":

> [T]o embarrass and discredit the insular government, to dramatize the fact that there were "patriots" in Puerto Rico prepared to die for the ideal of freedom, for propaganda purposes to fire a shot "heard around the world". If that objective … had been the only objective of the Nationalist leaders, then we would agree that the outbreaks of October 30, 1950, did not constitute an "insurrection" within the meaning of the particular insurance policies.

29

*Id.*

Significantly, the Court concluded that the uprising could be considered an "insurrection" only if the "maximum objective" of overthrowing the U.S. government in Puerto Rico was, in fact, at least one of the objectives that the Nationalists had in mind as they prepared and carried out their attacks. *Id.* If the Nationalists had only one or more lesser or different objectives in mind, then the attacks could not constitute an insurrection. *Id.* The Court of Appeals did not decide whether the Nationalists did or did not have one or more of these objectives as an objective of their violent uprising, or that the uprising was an insurrection, only that the trial court's jury instructions on this point were reversible error because they had been unduly favorable to the insured. *Id.*

In *Pan Am*, this Court affirmed the lower court's determination that there had been no insurrection because the PFLP – a Palestinian terrorist group that hijacked and destroyed an airplane – did not have the requisite intent to overthrow any government. 505 F.2d at 1018. The specific purpose of the PFLP was not to try to depose Jordan's King Hussein, but to "protest[] the sale of Phantom jets to Israel by the United

30

States" and in so doing to strike "a 'symbolic blow' in the PFLP's fight against the United States." *Id.* at 1019.

The insured hotel in *Holiday Inns v. Aetna Insurance Co.*, 571 F.Supp. 1460, 1466 (S.D.N.Y. 1983) was damaged over the course of six months by fighting among several different warring factions. The court determined there had been no insurrection, because none of the groups that damaged the hotel had any intent to overthrow the government. *Id.*, pp.1488, 1493. The court specifically noted that intent by certain of the fighting groups to preserve the governmental status quo (i.e., Christian groups that were fighting to maintain Christian control of the government) **could not be insurrectionary**. *Id.* at 1477, n.130.

Similarly, political violence directed by the Maduro regime to Guaidó or its other political opponents, would necessarily have to be non-insurrectionary in nature (i.e., not for the specific purpose of ***seizing*** power but to "embarrass and discredit" Guaidó, to "strike a symbolic blow" against the U.S. political interests seen by Maduro as supporting Guaidó, or for similar propaganda purposes).[2] The Policy does not insure

---

[2] For example, attacks by the Maduro government on a humanitarian aid convoy entering Venezuela by land from Colombia or unarmed demonstrators – i.e., not soldiers or paramilitary combatants vying with

against the violent or authoritarian acts of a ruling government to maintain its rule, unfair or undemocratic elections, the degradation of the rule of law, expropriation, political violence, or other political risks in Venezuela or elsewhere. CITGO's allegations describe not an insurrection or other war risk from an uprising or other armed conflict directed ***against the government***, but political risks which are activities **by the government**. While some of these political risks might have been covered by a political risk insurance policy, that is not the Policy Reinsurers issued.

### 3. The District Court Erred as a Matter of Law in Finding that Juan Guaidó Led a "Constituted Government" that Could be "Overthrown" by "Insurrection" Notwithstanding Its Lack of any Governmental Powers to be Seized

To be the "constituted government" of Venezuela for purposes of the insurrection definition established by this Court in *Pan Am*, the Guaidó

---

Maduro for governmental power within Venezuela – could not have been for the purpose of overthrowing any government and seizing its powers. Indeed, there is no evidence that any violent or other acts by the Maduro regime were even for the purpose of ***maintaining*** the power which it already had, as opposed to, e.g., discrediting or humiliating his political opponents, as there is no evidence that the Guaidó faction or anyone else ever seriously challenged Maduro's retention of power. The District Court's contrary finding is merely an unsupported assumption. *See* Dkt. 182, p.3.

"government" needed to have both actual governmental power susceptible of "seizure" by an insurrectionary opposition, as well as legitimate, governmental authority under the Venezuelan Constitution to wield that power. This is made clear by this Court's use of the phrase "lawfully constituted regime."[3] *See Pan Am*, 505 F.2d at 1005. The purported Guaidó "government" never had either of these requirements to be the "constituted government" of Venezuela.[4]

> a. **The District Court Erred as a Matter of Law by Concluding that the Controlling War Risk Insurance Coverage Case Law "Contain[s] No Requirement that a Government Hold *De Facto* Power for It To Be Insurrected Against."**

---

[3] A "regime" is "a government in power." (Regime, Merriam-Webster.com (last visited May 14, 2024)). "A particular ruling group, government, or administration, esp. an authoritarian one." Regime, Oxford English Dictionary, oed.com (last visited May 14, 2024).

[4] This Court's decision to acknowledge the inarguable objective reality that the Guaidó government was never the government of Venezuela, either in fact or as a matter of Venezuelan law (for the reasons discussed further herein), could not be contrary to any currently-held position of the executive branch. There is no authority for the proposition that an Article III Court is precluded from taking a position on the legality of a foreign government as a matter of its own internal laws simply because it might be said to contradict a previously-held position of the executive branch of the U.S. government. Any such rule would be both wholly incompatible with separation of powers principles and unworkable in view of the possibility of the executive branch position changing due to acknowledgment that it had no factual basis in the first place – as it may well have done in this very case.

33

The District Court suggests, without explanation, that actual governmental powers (e.g., police and military power) are not what is meant by "powers" as used in the insurrection definition set forth by this Court in *Pan Am*. Dkt. 182, n.7. The District Court thus concluded that the Maduro government was an "insurrection" against the Guaidó "government" despite admitting that there is not a single example of an "insurrection," whether in case law or in history generally, against a purported "government" that lacks governmental powers to be seized. *See* Dkt. 182, p.22. Moreover, this conclusion of the District Court ignores the controlling definition of "insurrection" set forth by this Court in *Pan Am* by erroneously reading the clear and unambiguous phrase "and seizing its powers" out of the definition. *Id.*, pp.21, 25 (erroneously concluding "that the Court must treat the *Pan Am* definition as containing no requirement that a government hold *de facto* power for it to be insurrected against").

In defining the term "insurrection" for war risk insurance coverage cases, this Court did not stop at saying just any "government" could be the target of a "violent uprising" comprising an insurrection. Rather it must be the "lawfully *constituted regime*" – i.e., one that is the

34

"established government" and so necessarily has governmental powers to be seized.[5] That is because the purpose of an insurrection – again, by definition – necessarily is to "seiz[e] [the government's] powers," *Pan Am*, 505 F.2d at 1017, i.e., "to overthrow the constituted government and to take possession of the inherent powers thereof." *Davila*, 212 F.2d at 736 (objective of insurrection is "overthrow of the old constituted government and the establishment of a new one in its place"). Because the essential purpose of an insurrection is the seizure of ***governmental powers***, it is impossible for acts directed toward a powerless "government" in name only – like the Venezuelan opposition formerly led by Juan Guaidó – to meet the definition of insurrection.

No case or other authority suggests that a group or faction that has never had physical control of ***any*** part of the territory of the nation or other political entity it purportedly governs could be properly called a

---

[5] *See* Merriam-Webster, Merriam-Webster.com (last visited May 14, 2024) (defining the transitive verb "constitute" as "set up, establish"); *see also Holiday Inns Inc. v. Aetna Ins. Co.*, 571 F. Supp. 1460, 1477-78, 1488 (S.D.N.Y. 1983) (applying *Pan Am* definition verbatim to chaotic military-driven urban warfare in Lebanon, equating "constituted government" with "established government," and explicitly holding that government that is target of insurrection must have governmental powers to be seized); Dkt. 175, Second Declaration of David John Bailey, KC ("2d Bailey Decl.") at ¶¶ 7-9.

"government" for any purpose, let alone for purposes of the *Pan Am* insurrection definition requiring a government to have "power" that can be seized by others. Neither is there historical precedent for the proposition that an "insurrection" can take place against a supposed "government" or other entity with no power or control over any territory.

### b. The District Court's decision on Summary Judgment was Internally and Fatally Inconsistent.

The District Court recognized that the Guaidó "government" in fact never had any power within Venezuela. *See* Dkt. 182, n.6. ("Guaidó had no *de facto* power within Venezuela"). The District Court further found that "the Maduro regime" has been the only government in power in Venezuela "during the period relevant to this litigation." *Id.*, p.22. Those findings are significant; they require summary judgment to have been granted in Reinsurers' favor.

That is because the District Court also recognized that without any power to seize from the Guaidó "government," there could be no insurrection based on CITGO's theory of the case positing Guaidó as leading the government and Maduro as leading the insurrection. "[I]f the Guaidó government is considered an entity that could be insurrected against – that is, if it need not have wielded significant *de facto* power for

36

an insurrection to be possible – then Maduro's violent actions to take control of Venezuela's governmental institutions were insurrectionary; *if not, then not*." Dkt. 182, n.8 (emphasis added).

The facts of this case admit only the latter possibility, as the Court itself recognized. Having thus answered its own question, that should have been the end of the District Court's analysis – there could have been no insurrection in Venezuela because the Guaidó government had no power in Venezuela that could have been seized.

### c. The District Court Erred as a Matter of Law in Concluding that the Recognition of Juan Guaidó as President of Venezuela by the United States is at all Relevant

The Guaidó government was never the "constituted government" of Venezuela – a fact not changed by the recognition of the Guaidó government by the United States. The District Court at first confused such "recognition" with governmental "power." Dkt. 182, n.6 ("Guaidó's recognition by some foreign nations . . . did give him some *de facto* power."). However, the "power" behind such "recognition" is one of the recognizing government, not of the "government" that is "recognized."

As the District Court itself acknowledged, the Guaidó government never had any governmental power in Venezuela, which is the only place

37

that matters to the central issue of whether there was an insurrection in Venezuela. To overcome this fatal flaw in its reasoning, the District Court invented "the recognition doctrine" (Dkt. 182, p.23) to circumvent the problem that the Guaidó government does not fit the definition of a "constituted government," as made clear in decades of prior caselaw. Indeed, the District Court used its newly created "recognition doctrine" to sweep aside "the holdings of past cases" (including *Pan Am*), finding them "of little use" in determining whether an insurrection occurred in the present case. *Id.*

While determinations by the U.S. or U.K. governments as to the recognition of another country's government may be significant as a matter of public international law, such determinations do not control the issue at bar, which is whether the war risk of "insurrection" has occurred under the terms of a private law insurance contract and its terms. *See* Dkt. 175, 2d Bailey Decl. at ¶ 9(c) (quoting *Spinney's*: The issue is not whether the events in Lebanon were recognised by the United Kingdom as amounting to a civil war in the sense in which the term is used in Public International Law …. The question here is whether there was a civil war within the meaning of the Policy. The two questions are

38

not the same and a pronouncement by the Secretary of State on one will not decide the other ….")  Recognition by the U.S. government of the Guaidó "government" does not control judicial construction of the meaning of the word "government" in a war risk clause in a commercial contract, which meaning includes "essentially the exercise of full executive and legislative ***power over an established territory***." (Dkt. 175, 2d Bailey Decl. at ¶ 9(d) (quoting *Luigi Monta of Genoa v. Cechofracht Co Ltd* [1956] 2 Q.B. 552); *see also* Dkt. 175, 2d Bailey Decl. at n.5, citing *White, Child and Beney v. Simmons and Eagle Star* (1922) 11 Ll. L. Rep. 7 at 12 ("soviet revolutionaries" were "government" as that word was used in insurance contract, even in the absence of recognition as either *de facto* or *de jure* government by U.K. government); Dkt. 149, Defs.' Memo. of Law in Opp. To Pl's Mot. for Partial S.J., pp.12-15 (explaining U.S. legal authorities showing the irrelevance of recognition to the issues to be decided in this case); Dkt. 156, Defs.' Reply Memo. of Law in Further Supp. of Defs.' Mot. for S.J. (same).

> **d. The District Court Erred in Determining, As a Matter of Foreign Law Under Federal Rule of Civil Procedure 44.1, that Juan Guaidó Became Venezuela's Interim President in Accordance with the Provisions of the Venezuelan Constitution Related to Vacancies No Later than January 10, 2019**

### i. There is no Basis to Conclude that Nicolás Maduro Abandoned the Venezuelan Presidency.

Neither does recognition by the U.S. government of the Guaidó "government" change the fact that there is no legal or constitutional basis for the Guaidó "government" as a matter of Venezuelan law. Accordingly, the date upon which the U.S. government recognized the Guaidó government is immaterial – what matters to the legality of the Guaidó government is when (or whether) the Guaidó government incepted as a matter of Venezuelan law. Realizing this fact and the resulting infirmity in its summary judgment decision's reliance on the United States' recognition as the basis for the legality of the Guaidó government, the District Court attempted to remedy this defect eight months later by calling for briefing by the Parties on the subject of **when** Juan Guaidó supposedly became Interim President of Venezuela **as a matter of Venezuelan law** and pursuant to Federal Rule of Civil Procedure 44.1.[6]

---

[6] As will be discussed further in Section II, the District Court's uncertainty at this time about when the Guaidó presidency began proves that the Court abused its discretion in finding, as a judicially noticed fact, that "[o]n January 23, 2019, Juan Guaidó, as president of the National Assembly, assumed the role of interim president pursuant to the provisions of the constitution related to vacancies." CITGO also took

40

The issue is critical to CITGO's case because under the District Court's analysis, until the time when a Guaidó "government" legally comes into existence, there could have been no insurrection in Venezuela at all.[7] This hotly contested issue resulted in multiple rounds of briefs and affidavits from Venezuelan lawyers submitted by both sides. But these submissions made clear that there was ***no colorable legal basis under Venezuelan law for the Guaidó government at any time***. Dkt. 241-252, 255-1, 267, 268. The District Court, after considering this evidence, and noting that the Venezuelan Supreme Court had "rejected the National Assembly's invocation of Art. 233,"[8] effectively reverted to its reliance upon its flawed "recognition doctrine." Trial Tr., Dec. 12, 2023, 35:1-15.

---

confused and inconsistent positions on the issue. *Compare* Dkt. 193, CITGO Pretrial Memorandum dated Sept. 19, 2023, p.2 (January 5, 2019) *with* Dkt. 233, p.5 (January 10, 2019) *and* Dkt. 124, CITGO Memo. of Law dated Mar. 14, 2022, p.8 (January 23, 2019) *and* Dkt. 127-15, Decl. of John Chamberlain dated Mar. 14, 2022, Exh. O, Expert Report of Dr. Miguel Ángel Santos at ¶ 21 (February 5, 2019).

[7] Dkt. 182, p. 19, citing *Pan Am* (emphasis in original): "[F]or there to be an "insurrection" there must be an intent to overthrow a ***lawfully constituted regime***." *Pan Am*, 505 F. 2d at 1005 (emphasis added).

[8] Article 233 of the Venezuelan Constitution is the functional equivalent to the 25th Amendment to the U.S. Constitution, dealing with incapacity or death of the President.

CITGO admits that Maduro was the President of Venezuela between 2013 and 2019 by virtue of his succession to the presidency upon the death of Hugo Chávez and victory in the 2013 presidential election. *See* Dkt. 58, Second Am. Compl., ¶34. The Venezuelan presidential election of May 20, 2018 resulted in the re-election of President Maduro to a six-year term of office (from 2019 to 2025). That Maduro was then the President of Venezuela and the head of its government is undisputed, as is the fact that Maduro received more votes than any other candidate and was for that reason determined to have won the election.[9]

The legitimacy of the Guaidó presidency and government as a matter of Venezuelan law thus depends not on the results of any popular presidential election – it is undisputed that Juan Guaidó never won any such election – but rather turns on the subsequent invocation of Article 233 of the Venezuelan Constitution by the Guaidó supporters in the National Assembly.

But Article 233 was never properly invoked because there was never a triggering "permanent unavailability" (also referred to as

---

[9] As the District Court recognized, "Maduro won that election[.]" Dkt. 182, p.3.

42

"absolute absence") of President Maduro. Article 233 expressly specifies what are the **only** "permanent unavailabilities," namely: (1) death, (2) resignation, (3) removal from office decreed by sentence of the Supreme Court of Justice, (4) permanent physical or mental incapacity, (5) abandonment of office, and (6) popular revocation of mandate. *See* Dkt. 243-1, 243-2. None of these "permanent unavailabilities" occurred, and so the National Assembly never had a legitimate basis for the appointment of Juan Guaidó as Interim President. It is undisputed that the National Assembly has never cited to or relied on any of the six "permanent unavailabilities" set forth in Article 233 as the basis for its decision to appoint Juan Guaidó as Interim President.

It is also undisputed that Maduro has never had his "removal from office decreed by sentence of the Supreme Court of Justice" as required by the Venezuelan Constitution. Thus, there was simply no basis for the National Assembly to have invoked Article 233 and declared the office of the President "vacant." The overturning of the election without any basis for doing so in Article 233 of the Venezuelan Constitution or otherwise thus made Guaidó's presidency illegitimate from its inception. (*See* Dkt. 251, Second Villarroel Decl. at pp. 1-2 (Indeed, the "National Assembly

43

has no constitutional authority to declare a presidential election illegitimate.")) The National Electoral Council – the Venezuelan authority empowered to declare the results of elections – proclaimed Maduro the winner in the presidential election for the 2019-2025 term. *Id.*, p.1. There is no legal basis for the National Assembly to have taken the specific and extraordinary step of overturning the outcome of a presidential election in order to install as an alternative "President" – for an indeterminate period of time – another person who indisputably did not win the election.[10]

Nevertheless, CITGO argued to the District Court "that the National Assembly on several occasions expressly declared that Maduro had abandoned the Presidency." Dkt. 247, p.5. The District Court apparently credited this factually incorrect assertion. *See* Trial Tr., Dec. 12, 2023, 33:22-34:2 (incorrectly finding that the cited document

---

[10] For its part, the District Court recognized the problem with the Article 233 applicability, yet nonetheless concluded that "The only provision under Article 233 that is reasonable to understand as the basis for these statements is an 'absolute absence' of "abandonment of office, declared as such by the National Assembly." (Trial Tr., Dec. 12, 2023, 33:17-20.) There is no explanation, however, as to how this finding can be reconciled with the District Court's repeated confirmations that Maduro never relinquished power and never, in fact, abandoned the office of the Presidency.

44

"declared" there had been an "abandonment" when, in fact, the "vacancy" was expressly attributed by the National Assembly to specific other affirmative acts of misconduct ***done by Maduro as President***, and not to any "abandonment" of the presidency). In fact, there is no record evidence that the National Assembly has ever done any such thing.

Inexplicably, the District Court found that the National Assembly had declared a vacancy *on January 7, 2017* (more than a year *before* the 2018 election) and again on August 21, 2018. (Trial Tr., Dec. 12, 2023, 33:17-34:25.) The National Assembly did not invoke Article 233 on either of those occasions because the purported "vacancy" was not a "permanent unavailability." That fact provides the answer to the question that was the cause of the District Court's request for briefing – i.e., that the Guaidó presidency and government ***never*** began because there was never a basis for it in Article 233. The District Court, however, avoided that answer. Instead, having erroneously conflated "vacancy" with "permanent unavailability," the District Court failed to explain or otherwise account

for why the National Assembly had not invoked Article 233 at the time it found a "vacancy" in 2017. (*See id.*)[11]

The National Assembly never declared that Maduro had "abandoned" the presidency under Article 233(5) of the Venezuelan Constitution because there is not a scintilla of evidence that he did so. All of the evidence shows that what he did, and always intended to do, is the exact opposite of "abandon" the Venezuelan presidency. Indeed, there is no way to reconcile the supposed "abandonment" by Maduro of the Venezuelan presidency with ***any*** of the facts or allegations about him pertaining to this case that are relied on by CITGO and the District Court. *See*, *e.g.*, Dkt. 182, p.4: "Maduro refused to cede control over the instruments of state power, preventing [Mr.] Guaidó from exercising authority within the country." (internal quotation marks and further citation omitted). Maduro was duly sworn in as President on January 10, 2019 for the six year term running from 2019 to 2025, pursuant to Article 231 of the Venezuelan Constitution. CITGO does not dispute this,

---

[11] Similarly, the U.S. Congress could not simply declare a sitting President to be incapacitated under the 25th amendment– and appoint a successor – without any evidence of incapacity.

or offer any colorable basis for supposed "abandonment" by Maduro of the Venezuelan presidency.

The National Assembly itself did no better in explaining or justifying its action to appoint Guaidó as Interim President. Instead, the National Assembly passed a *post hoc* statute in an attempt to retroactively justify the clearly unconstitutional appointment – but without even alleging that Maduro had triggered Article 233(5) by "abandoning" the presidency, and without identifying any supposed act of "abandonment" or other "permanent unavailability" under Article 233 that could serve as the legal basis for the appointment. That statute thus proves only that the National Assembly recognized that the Guaidó "government" it created out of thin air was both unconstitutional and without basis in Venezuelan law.

Venezuela's highest Court – the Supreme Court of Justice – immediately rejected the National Assembly's invocation of Article 233 as a purported basis to install the Guaidó "government," voiding that government as unconstitutional. *See* Dkt. 244, Defs.' Initial Br., pp.5-6; *see also* Dkt. 251, Second Villarroel Decl., p.2 (explaining that the Constitutional Chamber of the Supreme Court of Justice nullified the

47

statute and found "that the National Assembly had violated the Rule of Law"). As a result, the National Assembly dispensed with even the pretense of following Article 233, which would have required a new election to take place within thirty days in the event of a "permanent unavailabilty." No such election occurred or was even attempted.

When Reinsurers' briefing and supporting affidavits pointed out the complete lack of any basis upon which Maduro could be said to have "abandoned" the Venezuelan presidency, or incurred any other "permanent unavailability" under Article 233, CITGO, and its Venezuelan law expert, ignored the issue in its answering and sur-reply papers, and did not even attempt to refute the point or explain how the National Assembly's appointment of Guaidó as Interim President possibly could have a factual basis in "abandonment" of the presidency by Maduro, or any other basis in Article 233, or any other provision of the Venezuelan Constitution or Venezuelan law.

## ii. The Guaidó Government Never Had a Legal or Constitutional Basis Under Venezuelan Law

Reinsurers thus showed conclusively that Juan Guaidó **never** became the Interim President of Venezuela consistent with Venezuelan law because the National Assembly did not have the power under the

48

Venezuelan Constitution to appoint him. Accordingly, there could have been no "insurrection" because there was no Guaidó government – either *de facto* or *de jure* – to which an insurrection could have been directed.

The District Court ignored the arguments and the evidence that lead inexorably to this conclusion because otherwise it would have needed to overturn its prior ruling on summary judgment, as well as its finding – as a judicially noticed fact – that "[o]n January 23, 2019, Juan Guaidó, as president of the National Assembly, assumed the role of interim president pursuant to the provisions of the constitution related to vacancies."

Instead, and because the briefing of the legitimacy of the Guaidó government under Venezuelan law did not permit the conclusion it had already made on that score, the District Court reverted to the recognition of the Guaidó government by the Trump administration **as a basis for the legality of the Guaidó government under the Venezuelan Constitution**. *See* Trial Tr., Dec. 12, 2023, 35:1-36:10 (refusing to consider the substantive Venezuelan legal analysis of the decision of Venezuela's highest court as to why Article 233 was not properly invoked by the National Assembly to appoint Guaidó as President that the

49

District Court had specifically requested from the parties simply on the basis that the U.S. government had recognized the Guaidó presidency).

Accordingly, there is no precedent for the situation presented here, which is a "government" without existence either in fact or under its own internal laws, and that was expressly voided by its own highest judicial authority. On the contrary, recognition of a Guaidó government violates U.S. Supreme Court precedent "that every sovereign state must recognize the independence of every other sovereign state; and that the courts of one will not sit in judgment upon the acts of the government of another, ***done within its own territory***." *United States v. Belmont*, 301 U.S. 324, 327 (1937) (emphasis added); *Oetjen v. Central Leather Co.*, 246 U.S. 297 (1918). Neither *Belmont* nor *Oetjen* involved a government not in *de facto* control of its territory. Quite unlike the governments led by Stalin in the U.S.S.R. and Carranza in Mexico, nothing was ever "done" by the fictional Guaidó "government" within its own territory of Venezuela.

Nothing in either *Oetjen* or *Belmont* requires this Court to be bound by the patently false statements about the triggering of Article 233 of the Venezuelan Constitution made by the Trump administration as the basis

50

for a Guaidó "government" that indisputably never controlled a square inch of Venezuelan territory. Neither is there any basis for construing *Oetjen* and *Belmont* as rendering mere U.S. recognition of the powerless Guaidó "government" as in any way relevant to the determination of a war risk insurance coverage dispute or the *Pan Am* requirement that a government to which an insurrection is directed must have powers to be seized.

Indeed, the U.S. government itself never in fact took its "recognition" of the Guaidó government seriously, its actions always demonstrating that it in fact recognized that the Maduro regime remained firmly in control of the Venezuelan government at all times.

There is simply no other way to explain how or why Executive Order 13857, issued *after* Guaidó's "inauguration," extended the already-existing Venezuelan sanctions regime to *Maduro-controlled* PDVSA by expressly defining PDVSA to be within the term "Government of Venezuela." (Dkt. 139-2, Exec. Order 13857 § 1.) Executive Order 13857 thus did the very opposite of recognize the Guaidó government: it continued to recognize, and to direct sanctions against, the *actual* "Government of Venezuela," now including PDVSA, led by Maduro.

51

### 4. The District Court Erred as a Matter of Law by Failing to Apply the Clear and Unambiguous Definition of "Insurrection" Set Forth in the Controlling War Risk Insurance Coverage Case Law to the Undisputed Facts of the Case and to Grant Reinsurers' Motion for Summary Judgment

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party bringing the summary judgment motion bears the initial burden of demonstrating the absence of a genuine issue of material fact through pleadings, depositions, answers to interrogatories, admissions in the record, affidavits, and any other form of evidence that would be admissible at trial. FRCP 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Summary judgment must be entered:

> against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."

*Celotex*, 477 U.S. at 322-23.

52

The fact that the Institute War Clauses are a coverage provision and not an exclusion means that it is CITGO's burden to prove an insurrection occurred that could have caused the loss, a burden it has failed to meet.

The District Court defined "[t]he primary question in this case" as "whether actions taken by Nicolás Maduro to consolidate power during the time that the cargo was lost represented an 'insurrection'" – apparently without any regard to whether there has been a "violent uprising." Dkt. 182, p.1. This incorrect framing of the central issue betrays the District Court's failure to understand and appreciate the legal standard for insurrection established by this Court in *Pan Am*. That standard says nothing about the "consolidation" of power already possessed. Rather, what is *clearly and unambiguously required* for there to be an insurrection – is "(1) a violent uprising by a group or movement (2) acting for the specific purpose of overthrowing the constituted government and seizing its powers." *Pan Am*, 368 F.Supp. at 1124. In other words, there must be a violent uprising that attempts to change the current regime. Where, as here, that "specific purpose" is necessarily lacking because the regime supposedly engaging in a "violent

uprising" already has all of the government's powers, there can be no insurrection.

As noted above, it is undisputed that Maduro controls the military and all territory and governmental instrumentalities in Venezuela, as he has done since 2013. The actions of Maduro and his supporters are clearly aimed at maintaining that status quo, a fact which conclusively precludes the possibility that those actions could have had the "specific purpose of overthrowing the constituted government and seizing its powers." *Holiday Inns*, 571 F.Supp. at 1487 (S.D.N.Y. 1983) (quoting *Pan Am.*, 368 F.Supp. at 1124 (S.D.N.Y. 1973), *aff'd* 505 F.2d at 1017 (2d Cir. 1974))(emphasis added).

In this regard, the *Holiday Inns* court specifically found that the intent of the right-wing Christian groups who acted violently to preserve the governmental status quo in Lebanon precluded the possibility of an insurrectionary intent: "I need not further consider the objectives of the right-wing groups, except to observe again that they were in the main devoted to preserving the governmental status quo, and hence cannot be regarded as insurrectionary." *Holiday Inns*, 571 F.Supp. at 1490 n.130. Accordingly, the Maduro government's actions to preserve the

54

governmental status quo – i.e., itself in power, and Guaidó a powerless "government" in name and U.S. recognition only – cannot be considered "insurrectionary" either.

## II. THE DISTRICT COURT ABUSED ITS DISCRETION IN TAKING JUDICIAL NOTICE OF FACTS THAT WERE CONTROVERTED AND NOT RELEVANT

Courts may only take judicial notice of facts outside the trial record that are "not subject to reasonable dispute." Fed. R. Evid. 201(b). Such facts must either be "(1) generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Id.*; *see also Alvary v. United States*, 302 F.2d 790, 794 (2d Cir. 1962).

### A. The District Court Inappropriately Noticed Facts in Dispute.

The District Court ignored the essential requirement that judicial notice may only be taken of facts "not subject to reasonable dispute ..." *See* Fed. R. Evid. 201(b). "[W]hen facts or opinions found in historical materials or secondary sources are disputed, it is error to accept the data (however authentic) as evidence." *Oneida Indian Nation of New York v. State of N.Y.*, 691 F.2d 1070, 1086 (2d Cir. 1982).

Further, judicial notice is wholly inappropriate for controverted facts that are central to the dispute. "Because the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b)." *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (holding that facts adjudicated in prior case were not indisputable); *see also Brown v. Piper*, 91 U.S. 37, 43 (1875) ("Care must be taken that the requisite notoriety exists. Every reasonable doubt upon the subject should be resolved promptly in the negative.").

In its motions, CITGO sought judicial notice of facts that were inappropriate for judicial notice, as they concerned the central controversy in the dispute. The judicially noticed fact that "[o]n January 23, 2019, Juan Guaidó, as president of the National Assembly, assumed the role of interim president pursuant to the provisions of the constitution related to vacancies" is directly controverted by the Defendants' submissions in briefing this issue, particularly the Declarations of Francisco Villarroel. *See* Dkt. 251, p.2; Dkt. 245, p.10.

Juan Guaidó's assumption of the presidency in 2019 is vigorously disputed, as clearly evidenced by the competing declarations of Mr. Villarroel and Carlos J. Sarmiento-Sosa. Indeed, the District Court's request for further briefing on "when President Guaidó's presidency began according to Venezuelan law, including but not necessarily limited to the proper interpretation of Article 233 of the Venezuelan Constitution," further reinforces the disputed nature of this fact. Dkt. 239, pp. 1-2. In fact, the District Court did not rule that Guaidó became President under Venezuelan law, but instead relied on the statement of President Trump, Secretary Pompeo's press release, and the "recognition doctrine," basing its ruling pursuant to Fed. R. Civ. Pro. 44.1 not on Venezuelan law but the actions of the United States. *See* Trial Tr., Dec. 12, 2023, 29:4-31:19.

Further, the nature and scope of the events on the ground in Venezuela was one of the central controversies in this case, and CITGO was unable to establish any facts showing an insurrection.[12]

---

[12] For example, the Venezuelan government forcibly prevented a food aid convoy organized by Guaidó supporters from entering the country from Columbia in February, 2019. The food aid was not insurrectionary, nor was preventing its illegal entry into Venezuela. It took place long before

57

## B. The District Court Noticed Facts That Were Not Relevant to the Issues.

Additionally, the District Court abused its discretion in granting CITGO's requests for judicial notice as the facts presented were irrelevant to this matter. While Rule 201 does not explicitly state that facts to be judicially noticed must be relevant and judicial notice is not subject to the relevancy requirement of Rule 402, nevertheless judicial notice should not be taken of facts that are not relevant to the issues to be determined by the jury. "Whether to take judicial notice 'is left in the court's discretion, but the matters to be noticed must be relevant.'" *Ellis v. Jackson,* 319 F. Supp. 3d 23, 35 (D.D.C. 2018) (quoting *Slate v. Am. Broad. Cos.,* 12 F.Supp.3d 30, 44–45 (D.D.C. 2013)).

The District Court granted CITGO's request for judicial notice of facts that were plainly prejudicial and irrelevant. In this case, the dispute concerned the seizure of the cargo aboard the Vessel pursuant to a local Venezuelan Court Order. The District Court judicially noticed events that took place hundreds of miles away and, in some cases, years before

---

and hundreds of miles away from where the Vessel sat, awaiting resolution of the dispute over payment for its cargo of oil.

the Vessel laden with CITGO's cargo was denied permission to sail. *See* Dkt. 182, p.15; Dkt. 238, pp.3-4.

## C. The Judicially Noticed Facts Were Not Appropriate Because They Are Not from Sources Whose Accuracy Cannot Reasonably Be Questioned.

Additionally, CITGO alleged that the facts to be noticed are based on sources "'whose accuracy cannot reasonably be questioned' within the meaning of Rule 201." *See* Dkt. 135, p.4. In granting CITGO's motions, the District Court imputed such indisputable accuracy to the contents of reports which themselves make no such claims to indisputable accuracy, and are obviously (and sometimes admittedly) based on unreliable, biased and undisclosed sources.

### 1. State Department Country Reports

First, the District Court abused its discretion in granting CITGO's request that the District Court take Judicial Notice of the factual contents of the State Department Country Reports on Venezuela for the years 2017, 2018, 2019, and 2020. The facts contained within the Country Reports are predominately recitations and summaries of reports and allegations the sources of which are not cited. These facts are not

59

generally known in this District, and the accuracy of these reports can be reasonably questioned.

The cases CITGO cited in support of judicial notice of the State Department Country Reports are all appeals from Board of Immigration Appeals decisions on applications for asylum. Applications for asylum require that the applicant show they "suffered past persecution or . . . ha[ve] a well-founded fear of future persecution." 8 C.F.R. § 208.13. There, it would be appropriate for a judge to apply a relaxed standard to evaluating a document produced by the U.S. Government describing the human rights situation in a country in order to review a decision by the U.S. Government regarding the human rights situation in that country. However, Reinsurers are not the U.S. Government and had no part in the production of the Country Reports.

Further, Country Reports are not issued in a vacuum but can be influenced in many directions in accordance with the political and diplomatic aims of the State Department or U.S. government. *See Niam v. Ashcroft,* 354 F.3d 652, 658 (7th Cir. 2004) (noting that the State Department can and does adjust its country reports based on whether the United States is or is not friendly with the ruling regime in the

country that is the subject of the report.). The United States government opposes President Maduro and aspects of the events described in Country Reports may be emphasized or exaggerated as a result.

Thus, it was an abuse of discretion for the District Court to take judicial notice of statements made in the Country Reports.

### 2. Congressional Research Service Report

The District Court further took judicial notice of the Congressional Research Service Report, "Venezuela: Background and U.S. Relations." The Report describes events at the Venezuelan-Colombian border in February, 2019 and in Caracas on April 30, 2019, events that bear no relationship to the circumstances of, and thus are irrelevant to, the cargo aboard the Vessel. Additionally, as CITGO relied on these facts to dispute the Reinsurers' arguments in the case, judicial notice should not have been given to facts disputed by the opposing party.

### 3. U.N. Reports

Finally, the District Court inappropriately took judicial notice of two U.N. Reports. Neither of these reports are sources "whose accuracy cannot reasonably be questioned." This is made clear by the Detailed Findings of the Independent Fact-Finding Mission on the Bolivarian

Republic of Venezuela, published on September 15, 2020, which clearly

sets forth its standard of proof:

> Consistent with other Fact-Finding Missions established by the Human Rights Council, the Mission used **"reasonable grounds to believe" as its standard of proof**. The reasonable grounds standard is met when factual information has been collected which would satisfy an objective and ordinarily prudent observer that the incident has occurred as described with a reasonable degree of certainty. The standard of proof is applied to both of the determinations relevant in the identification: (a) that the violation or crime occurred, and (b) that the individual identified was responsible. **This standard of proof is lower than that required in criminal proceedings to sustain an indictment, but is sufficiently high to indicate that further investigations are warranted.**

(Emphasis added). This does not meet a "beyond a reasonable doubt"

standard, and may not even satisfy a "preponderance of the evidence"

threshold. In any event, it does not meet a standard of "accuracy [that]

cannot reasonably be questioned." Therefore, it was an abuse of

discretion for the District Court to treat any facts within the report as

beyond reasonable questioning.

## III. THE COURT'S JURY INSTRUCTION ON CAUSATION WAS LEGALLY INCORRECT FOR THIS WAR RISK INSURANCE COVERAGE DISPUTE

This Court in *Pan Am* also made clear that the proper causation standard to be applied in a marine war risks insurance case such as this one is the "proximate cause" standard. 505 F.2d at 1006-09. Further, this Court expressly noted that "Remote causes of loss are not relevant to the characterization of an insurance loss. In the context of this commercial litigation, the causation inquiry stops at the efficient physical cause of the loss; it does not trace events back to their metaphysical beginnings." *Id.* at 1006. Quoting *Queen Insurance Co. v. Globe & Rutgers Fire Insurance Co.,* 263 U.S. 487, 492, 445 S.Ct. 175, 176, 681. Ed 402 (1924) this Court in *Pan Am* observed: "Justice Holmes wrote: 'The common understanding is that in construing these policies we are not to take broad views but generally are to stop our inquiries with the cause nearest to the loss'." *Id.* (quoting 263 U.S. 487, 492).

This Court in *Pan Am* noted that the foregoing is also the law of New York. *Id.* at 1006. In fact, the standard in New York is even stricter: "New York courts give especially limited scope to the causation inquiry. The leading case is *Bird v. St. Paul Fire & Marine Insurance Co.*" 224 N.Y. 47, 120 N.E. 86 (1918) (Cardozo, J.) That case, too, is a marine insurance case, on which this Court observed: "… the scope of causation

63

relevant to the insurance nature of a loss is largely a question of fact depending on the reasonable expectations of businessmen: 'The question is not what men ought to think of as a cause. The question is what they do think as a cause'." *Pan Am*, at 1006 quoting *Bird*, 224 N.Y. 47, 52 (1918).

This Court in *Pan Am* went on to examine the history of the development of the proximate cause test, as explained in caselaw dating back to the mid 1800's involving marine insurance losses under all risk and war risk policies. 505 F.2d at 1006-07. The conclusion of this Court following that survey of the law was that: "These cases establish a mechanical test of proximate cause for insurance cases, a test that looks only to the 'nearest cause to the loss'" *Pan Am*, at 1007, citing *Queen Insurance Co.* supra at 492.

This Court could not have been more explicit as to the applicability of the proximate cause test to marine insurance policies such as this one. Nevertheless, and over objection, the Trial Court instructed the jury to apply a causation standard based on the "arising from" test rather than Proximate Cause:

Jury Instruction III. B. 4.

64

> The phrase "arising from" means that there is at least some causal relationship between the injury and the risk for which coverage is provided. It is important to keep in mind that the words "arising from" have broader significance than the words "caused by." Under the law, and event can "arise from" a particular circumstance even if the causal relationship is attenuated. "Arising out of" means originating from, incident to, or having connection with. A seizure may have "arisen from" more than one cause. Again, you must apply the meaning I have given you when reaching your verdict."

Trial Tr., Dec. 18, 2023, 870:16-25.

This broad test is the antithesis of the "proximate cause" standard which the Court below should have applied. The Trial Court's decision to apply the "arising from" standard instead of proximate cause was based on a distinguishable New York Court of Appeals decision: *Maroney v. N.Y. Cent. Mut. Fire Ins. Co.*, 5 N.Y.3d 467 (2005). But that case does not concern a marine insurance policy, or anything of the sort. It is a case involving a liability policy (not a property policy), and an injury to a six – year – old girl who was kicked in the head by a horse. *Id.* at 470-71. In finding coverage for a landowner's liability, the Court of Appeals applied the broadest test of causation.

In this case, the Trial Court elected to adopt that broad causation standard rather than the instruction patterned after the *Pan Am* decision

65

as requested by Reinsurers. [13] It is clear that had the Trial Court applied

the proximate cause standard, summary judgment initially, or a directed

---

[13] Defendants' counsel made clear on the record during trial that the objection to the use of the "arising from" causation standard was an error to be preserved on appeal, stating: "We just want to make sure we are clear on the record with respect to both the causation standard and arising from. We just want to make sure were not waiving any rights with respect to our views on how proximate cause should still be the test with respect to those two and as enunciated in the *Pan Am* case." Trial Tr., Dec. 14, 2023, 581:18–22. Also stating: "I just want to make sure that we are clear on the record, our continuing objection on the causation definition." *Id.* at 603:14-16. However, the Trial Court would not accept the objection without imposing the condition that defense counsel send a letter in the middle of trial, explaining the basis for the position that the *Pan Am* standard (proximate cause) should apply rather than "arising from." The Trial Court added that the letter must be delivered to Chambers by 8 am the following morning and the Trial Court threatened Rule 11 sanctions for submitting such a letter – despite the fact that the substance of the letter was already the subject of briefing signed by counsel. Dkt. 220. The Court in fact invoked Rule 11 three times and admonished counsel that the letter would be reviewed in light of counsel's "professional responsibilities as a member of the bar and the court to present arguments that are supported by law." This, despite the fact that counsel had cited the *Pan Am* decision, and requested jury instruction in conformity with the Second Circuit's holding in that case. Faced with an impossible deadline, in the middle of trial, for the submission of a letter to the Court by the following morning, and having been threatened in no uncertain terms with Rule 11 sanctions for submitting such a letter, counsel perceived that the Trial Court was leaving no choice but to withdraw the objection. But the obvious intent of the Reinsurers was to maintain the objection on appeal as demonstrated clearly by the record. *Id.* at 603:17-608:12.

verdict subsequently, should have been granted to Reinsurers.[14] This is because there was no evidence whatsoever of any "insurrection" that caused the seizure of CITGO's cargo from the Vessel. On the contrary, the evidence – both on the summary judgment motions and at trial – made clear that not only was there no violence of any kind anywhere near the ship at any time during its one year wait in Venezuelan waters, the seizure was due entirely to a Court Order obtained by the owner of the oil, PDVSA, who was awarded "restitution" of the cargo. *See* Defs.' Exh. RR; Dkt. 139-25; Dkt. 142-1, 198:21-203:12.

This "restitution" and return of the cargo to PDVSA was what CITGO and PDVSA themselves planned for weeks after the extension of U.S. sanctions to PDVSA made clear that CITGO would be unable to pay for the cargo. Dkt. 139-10 to 139-14. Moreover, the U.S. sanctions extended to ***Maduro-controlled*** PDVSA when it – and not the Guaidó

---

[14] The jury instruction in this case (as well as the summary judgment decision) flies in the face of not only New York law but the U.S. Supreme Court's recent decision in *Great Lakes Insurance v. Raiders Retreat Realty Co.*, 601 U.S. 65 (2024), a case handed down on February 21, 2024, which noted the importance of uniform maritime law given that marine insurance is "an integral part of virtually every maritime transaction, and maritime commerce is a vital part of the nation's economy." 601 U.S. at 75 (citation omitted).

faction – was defined by Executive Order 13857 to be the "Government of Venezuela." In other words, the sanctions were extended to PDVSA precisely because Maduro remained in the government – and neither "abandoned" his position at the head of that government nor led an "insurrection" against it.

In any event, what matters is not whether the Venezuelan Court Order was correct, but that it had no relationship to any "insurrection" or even to any violence at all. CITGO's allegations of violence, even if accepted at face value, are all too far removed temporally or spatially to have had a causal relationship to the detention of the Vessel or the removal of its cargo. *See* Dkt. 58, Second Am. Compl. ¶¶35, 37 (allegations of "insurrection" or violence prior to 2018). There is no evidence, or even an allegation, of any violence, actual or threatened, political, insurrectionary or otherwise, in the vicinity of the Vessel at any time during its detention. The presence of the Venezuelan Navy for the Vessel's transit to the discharge port was not violent, threatening or even hostile; when one of the Venezuelan Navy vessels departed, the Vessel's Master requested a replacement for the ***protection*** of the Vessel. Dkt. 142-1, 224:18-226:13 (Vessel's Master citing "piracy and boarding issues

68

and security concerns" at the discharge port for wanting guard boat of the Venezuelan Navy to be present).

## CONCLUSION

For all of the foregoing reasons, Reinsurers respectfully request that this Court (1) reverse the March 15, 2023 decision of the District Court granting summary judgment in part to CITGO and denying summary judgment to Reinsurers and (2) grant summary judgment to Reinsurers on the basis that there was no "insurrection" in Venezuela that could have been the basis of CITGO's marine war risk insurance claim. In the alternative, Reinsurers respectfully request that this Court order a new trial on the basis that the District Court's factual findings on the issue of whether there was an insurrection and instructions to the jury as to judicially noticed facts and the causation standard to be applied were improper.

Dated:    New York, New York
          May 14, 2024

Clyde & Co US LLP

By: */s/ John M. Woods*
    John M. Woods

The Chrysler Building
405 Lexington Avenue, 16th Floor
New York, New York 10174
Tel: (212) 710-3900
Fax: (212) 710-3950
Email: john.woods@clydeco.us

*Attorneys for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies pursuant to Fed. R. App. P. 32(g) that the Brief complies with the type-volume limitation of Local Rule 32.1(a)(4) because, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f), this document contains 13,975 [no more than 14,000] words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface Century Schoolbook in 14 point size.

Dated:      New York, New York
            May 14, 2024

                              Clyde & Co US LLP

                              By: */s/ John M. Woods*
                              _____
                                  John M. Woods

                              The Chrysler Building
                              405 Lexington Avenue, 16th Floor
                              New York, New York 10174
                              Tel: (212) 710-3900
                              Fax: (212) 710-3950
                              Email: john.woods@clydeco.us

                              *Attorneys for Defendants-
                              Appellants*