# 24-0227-cv

## United States Court of Appeals
### *for the*
## Second Circuit

CITGO PETROLEUM CORPORATION,

*Plaintiff-Appellee*,

— v. —

ASCOT UNDERWRITING LIMITED, for and on behalf of Lloyd's Syndicate 1414, PIONEER UNDERWRITING LIMITED, for and on behalf of Syndicate 9146, MS AMLIN UNDERWRITING LIMITED, for and on behalf of Lloyd's Syndicate 2001, TRAVELERS SYNDICATE MANAGEMENT LIMITED, for and on behalf of Lloyd's Syndicate 5000, BRIT SYNDICATES LIMITED, for and on behalf of Lloyd's Syndicate 2987, SOMPO INTERNATIONAL INSURANCE, for and on behalf of Lloyd's Syndicate 5151, CHAUCER SYNDICATES LIMITED, for and on behalf of Lloyd's Syndicate 1084, MARKEL SYNDICATE MANAGEMENT LIMITED, for and on behalf of Lloyd's Syndicate 3000, NEON UNDERWRITING LIMITED, for and on behalf of Lloyd's Syndicate 2468, STARSTONE INSURANCE SE,

*Defendants-Appellants*.

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PAGE PROOF BRIEF FOR PLAINTIFF-APPELLEE

DAVID F. KLEIN
MARK J. PLUMER
JOHN P. CHAMBERLAIN
JEFFREY W. MIKONI
PILLSBURY WINTHROP SHAW
   PITTMAN LLP
1200 17th Street, NW
Washington, DC 20036
(202) 663-8000

RICHARD P. DONOGHUE
PILLSBURY WINTHROP SHAW
   PITTMAN LLP
31 West 52nd Street
New York, New York 10019
(212) 858-1000

*Attorneys for Plaintiff-Appellee*

 (800) 4-APPEAL • (330255)

# CITGO CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for CITGO Petroleum Corporation certifies as follows:

Appellee CITGO Petroleum Corporation is a wholly-owned subsidiary of CITGO Holding, Inc. No publicly traded company owns more than 10 percent of CITGO Petroleum Corporation's stock.

CITGO Holding, Inc. is a wholly-owned subsidiary of PDV Holding, Inc. No publicly traded company owns more than 10 percent of CITGO Holding, Inc.'s stock.

PDV Holding, Inc. is a wholly-owned subsidiary of Petróleos de Venezuela, S.A. (PDVSA). No publicly traded company owns more than 10 percent of the stock in PDV Holding, Inc.

PDVSA is the Venezuelan state oil company, and no publicly traded company owns more than 10 percent of its stock.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................iv

INTRODUCTION ................................................................................... 1

STATEMENT OF THE ISSUES .......................................................... 2

STATEMENT OF THE CASE ............................................................. 3

A.   Facts .............................................................................................. 3

    1. CITGO's Purchase. ............................................................... 3

    2. The Insurrection. ................................................................... 3

    3. The Thirteen-Month Standoff Over the Cargo, and Its
    Seizure ....................................................................................... 6

    4. The Insurance Policy ............................................................. 9

B.   Relevant Procedural History and Rulings Presented for
    Review ......................................................................................... 10

SUMMARY OF ARGUMENT ............................................................ 14

ARGUMENT ........................................................................................ 20

I.   THE DISTRICT COURT CORRECTLY DECIDED THE
    ISSUE OF COVERAGE FOR "INSURRECTION" ON THE
    PARTIES' CROSS-MOTIONS FOR SUMMARY
    JUDGMENT. ............................................................................... 20

    A. The District Court Correctly Determined that the
    Ambiguous Grant of Coverage under the Institute War
    Clauses Must Be Construed in Favor of Coverage. ................. 20

    B. The District Court Correctly Determined that there Was
    an Insurrection Triggering Coverage under the Policy. .......... 30

ii

1. The District Court Correctly Determined that the Guaidó Government Was the Lawfully Constituted Government. . 31

2. The District Court Correctly Determined that Maduro Sought to Remove the Lawful Government with Violence. 39

C. Reinsurers' Arguments that Guaidó's Government Was Not the Lawfully Constituted Government Are Wrong...........45

II. THE DISTRICT COURT PROPERLY TOOK JUDICIAL NOTICE OF FACTS FROM RELIABLE SOURCES WHOSE ACCURACY REINSURERS NEVER MEANINGFULLY CHALLENGED. ..................................................................49

A. Reinsurers Failed to Raise Any Dispute as to the Accuracy of Any of the Facts at Issue.......................................50

B. The Facts Noticed Were Relevant and Non-Prejudicial. .........52

C. The State Department Reports, Congressional Research Report, and U.N. Reports Are Proper Subjects of Judicial Notice. .......................................................54

1. State Department Country Reports....................................54

2. Congressional Research Service Report .............................56

3. United Nations Reports .....................................................57

III. THE DISTRICT COURT'S JURY INSTRUCTION ON CAUSATION CORRECTLY STATED GOVERNING NEW YORK LAW. ..................................................................58

CONCLUSION ......................................................................68

CERTIFICATE OF COMPLIANCE ......................................................70

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Cas. & Sur. Co. v. Liberty Mut. Ins. Co.,*
91 A.D.2d 317 (4th Dep't 1983) .................................................... 61, 62

*Am. Economy Ins. Co. v. Holabird Root,*
886 N.E.2d 1166 (Ill. App. 1st Dist. 2008) ........................................ 63

*B.T. Produce Co., Inc. v. Robert A. Johnson Sales, Inc.,*
354 F. Supp. 2d 284 (S.D.N.Y. 2004).................................................. 54

*Barber v. Nestlé USA, Inc.,*
154 F. Supp. 3d 954 (C.D. Cal. 2015) ................................................ 57

*Belt Painting Corp. v. TIG Ins. Co.,*
100 N.Y.2d 377 (2003).................................................................. 24

*Bird v. St. Paul Fire & Marine Ins. Co.,*
224 N.Y. 47 (1918)................................................................... 65, 66

*In re Boyer,*
328 Fed. App'x 711 (2d Cir. 2009) .................................................... 49

*Burlington Ins. Co. v. NYC Transit Auth.,*
29 N.Y.3d 313 (2017)................................................................... 60

*Caballero v. Fuerzas Armadas Revolucionarias de Colombia*
No. 20-MC-40-LJV, 2021 WL 1884110 (W.D.N.Y. May 11,
2021) ............................................................................... 34

*Casa Express Corp. v. Bolivarian Republic of Venezuela,*
492 F. Supp. 3d 222 (S.D.N.Y. 2020)................................................ 34

*Cont'l Cas. Co. v. Rapid-American Corp.,*
80 N.Y.2d 640 (1993)............................................................... 23, 24

*Country-Wide Ins. Co. v. Excelsior Ins. Co.,*
147 A.D.3d 407 (2017)................................................................ 62

*Cragg v. Allstate Indem Corp.*,
17 N.Y.3d 118 (2011) ................................................................ 64

*Dobrota v. I.N.S.*,
195 F.3d 970 (7th Cir. 1999) .................................................... 55

*Farook v. Holder*,
407 Fed. App'x 545 (2d Cir. 2011) ......................................... 54

*Federal Ins. Co. v. American Home Assur. Co.*,
639 F.3d 557 (2d Cir. 2011) ..................................................... 62

*Great Lakes Insurance v. Raiders Retreat Realty Co.*,
601 U.S. 65 (2024) .................................................................... 60

*Hain v. Jamison*,
28 N.Y.3d 524 (2016) ................................................................ 61

*Holiday Inns Inc. v. Aetna Ins. Co.*,
571 F. Supp. 1460 (S.D.N.Y. 1983) ............................... *passim*

*Home Insurance Co. v. Davila*,
212 F.2d 731 (1st Cir. 1954) ..................................... 27, 42, 44

*Jimenez v. Palacios*,
250 A.3d 814 (Del. Ch. 2019), *revised* (Aug. 12, 2019) ............ 7, 34, 38

*Kareem v. Haspel*,
986 F.3d 859 (D.C. Cir. 2021) ................................................. 56

*King v. Burwell*,
576 U.S. 473 (2015) .................................................................. 23

*Lewis v. M&T Bank*,
No. 21-933, 2022 WL 775758 (2d Cir. Mar. 15, 2022) ........................ 49

*Looney Ricks Kiss Architects, Inc. v. State Farm Fure & Cas. Co.*,
677 F.3d 250 (5th Cir. 2012) .................................................... 63

*Manufacturers Cas. Ins. Co. v. Goodville Mt. Cas. Co.*,
170 A.2d 571 (Pa. 1961) ........................................................... 63

*Maroney v. N.Y. Cent. Mut. Fire Ins. Co.*,
  5 N.Y.3d 467 (2005) ................................................................ *passim*

*Merritt Env't Consulting Corp. v. Great Divide Ins. Co.*,
  2018 WL 6177970 (E.D.N.Y. Oct. 10, 2018) ........................ 62

*Morgan Stanley Group, Inc. v. New Eng. Ins. Co.*,
  225 F.3d 270 (2d Cir. 2000) ................................................. 23

*Pan Am. World Airways v. Aetna Cas. & Sur. Co.*,
  505 F.2d 989 (2d Cir. 1974) ........................................ *passim*

*Pape v. Home Ins. Co.*,
  139 F. 2d 231 (2d Cir. 1943) ............................................. 42

*Queen Ins. Co. v. Globe & Rutgers Fire Ins. Co.*,
  263 U.S. 487 (1924) ............................................................ 65

*Regal Constr. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
  15 N.Y. 3d 34 (2010) .......................................................... 62

*Ren v. Gonzalez*,
  164 Fed. App'x 33 (2d Cir. 2006) ...................................... 54

*Rusoro Mining Ltd. v. Bolivarian Republic of Venez.*,
  2019 U.S. App. LEXIS 17543 (D.C. Cir. May 1, 2019) ...... 34

*Selective Ins. Co. of Am. v. Cnty. of Rensselaer*,
  26 N.Y.3d 649 (2016) .................................................. 21, 22

*Shehu v. Gonzales*,
  443 F.3d 435 (5th Cir. 2006) ............................................. 55

*Spinney's (1948) Ltd. v Royal Ins. Co. Ltd.*
  [1980] 1 Lloyd's Rep. 406 ................................................. 35

*State v. Home Indem. Co.*,
  66 N.Y.2d 669 (1985) .................................................. 22, 30

*Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*,
  913 So.2d 528 (Fla. 2005) ................................................. 63

vi

*Turner Constr. Co. v. Kemper Ins. Co.*,
  198 Fed. Appx. 28 (2d Cir. 2006) ........................................ 62

*United States v. Bastian*,
  770 F.3d 212 (2d Cir. 2014) ............................................... 47

*United States v. Palmer*,
  16 U.S. 610 (1818) ............................................................. 33

*Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*,
  141 S.W.3d 198 (Tex. 2004) ............................................... 63

*Westview Assoc. v. Guar. Nat'l Ins. Co.*,
  95 N.Y.2d 334 (2000) ......................................................... 24

*Williams v. Suffolk Ins. Co.*,
  38 U.S. 415 (1839) .............................................. 33, 35, 36, 37

*World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*,
  345 F.3d 154 (2d Cir. 2003) ............................................... 25

*XL Specialty Ins. Co. v. Agoglia*,
  2009 WL 1227485 (S.D.N.Y. Apr. 30, 2009) ....................... 62

*York v. Sterling Ins. Co.*,
  67 N.Y.2d 823 (1986) ......................................................... 23

*Youkhana v. Gonzales*,
  460 F.3d 927 (7th Cir. 2007) ............................................. 55

*Zivotofsky v. Kerry*,
  576 U.S. 1 (2015) ............................................................... 32

**Rules**

Federal Rules of Civil Procedure
  Rule 44.1 ............................................... 13, 17, 47, 48
  Rule 50(b) ....................................................... 68
  Rule 56.1 .................................................. 10, 12, 40

Federal Rules of Evidence
  Rule 201 ............................................................. 2

**Other Authorities**

Constitution of the Republic of Venezuela
    Article 233 ................................................................. 4, 46, 48
    Article 230 ........................................................................ 48
    Article 231 ........................................................................ 48

5 Corbin on Contracts § 24.3 ................................................ 23

## INTRODUCTION

This case involves a claim by Plaintiff-Appellee, CITGO, to recover losses from Defendant-Appellant Reinsurers under a marine cargo insurance policy for crude oil lost in an illegal seizure. Venezuelan dictator Nicolás Maduro refused to leave the presidency at the end of his lawful term. Forces loyal to Maduro seized the crude oil from a vessel chartered by CITGO, a company controlled by the legitimate, U.S.-recognized Interim President Juan Guaidó and the Venezuelan National Assembly. This seizure was a strike against legitimate authority in the context of an insurrection involving armed violence against the government and its supporters.

The insurance policy covered "losses … caused by … seizures … arising from … insurrection, or civil strife arising therefrom." The District Court correctly determined that Maduro's use of violence to usurp authority was an insurrection under the policy, and at trial the jury properly found that CITGO's loss was caused by a seizure that arose from this insurrection. Reinsurers' arguments on appeal confuse bedrock rules of insurance policy construction, ignore controlling law on the legal effects of U.S. recognition of foreign governments, are foreclosed by

1

Reinsurers' own factual admissions, and seek to circumvent controlling New York law on the causation standard required under the term "arising from." The judgment should be affirmed.

## STATEMENT OF THE ISSUES

1. Whether the District Court correctly determined on summary judgment, based on facts not reasonably in dispute and under applicable law, that an "insurrection" occurred in Venezuela within the meaning of the marine cargo insurance policy at issue. The standard of review is *de novo* for this issue.

2. Whether the District Court properly exercised its discretion under Federal Rule of Evidence 201 to take judicial notice of certain facts reported in reliable governmental publications. The standard of review is abuse of discretion for this issue.

3. Whether the District Court correctly instructed the jury on the applicable causation standard under New York law. The standard of review is *de novo* for this issue.

## STATEMENT OF THE CASE

### A. <u>Facts.</u>

#### 1. **CITGO's Purchase.**

CITGO is an indirect wholly-owned U.S. subsidiary of Petróleos de Venezuela, S.A. ("PDVSA"), Venezuela's state-owned oil company. District Court Dkt. ("Dkt.") 151 ¶ 1. The president of Venezuela has authority to appoint PDVSA's Managing Board and, indirectly, CITGO's board. *Id.* ¶ 2.

In January 2019, CITGO purchased crude oil ("the Cargo") from PDVSA. *Id.* ¶¶ 8-9, 17-24. Testimony at trial established that CITGO paid for the Cargo under longstanding contracts not in cash, but by delivering cargos of refined petroleum products and other services of offsetting value to PDVSA. 12/14/23 Trial Tr. 466:24-506:21. The jury rejected Reinsurers' alternative theory that CITGO never paid for the Cargo. Dkt. 275. PDVSA loaded the Cargo onto CITGO's chartered vessel, the M/T Gerd Knutsen ("Gerd"), at two locations in Venezuelan waters between January 20-27, 2019. Dkt. 151 ¶ 9.

#### 2. **The Insurrection.**

The purchase and loading of the Cargo occurred at a time of pivotal events in Venezuela's history. The constitutional term of Venezuela's

president, Nicolás Maduro, ended on January 10, 2019, but he refused to leave office.[1]  Venezuela's National Assembly determined the presidency was vacant.  *Id.* ¶ 43.  Pursuant to Article 233 of Venezuela's constitution, this resulted in the accession of Juan Guaidó, then-president of the National Assembly, to the office of interim president until valid elections could be held.  *Id.*  On January 23, 2019, the United States recognized Guaidó as Venezuela's president and imposed new sanctions on the Maduro regime, including on PDVSA.  *Id.* ¶¶ 44-45, 47-49.

Maduro's refusal to leave office was the latest manifestation of increasingly violent and anti-constitutional conduct dating back to at least 2015.  After a supermajority of legislators opposed to Maduro won control of the National Assembly, Maduro deployed military and paramilitary personnel to raid the National Assembly while it was in session; harassed, arrested, and tortured opposition legislators; and sought to replace the National Assembly with a new, extra-constitutional legislature packed with Maduro loyalists, called the National *Constituent*

---

[1] According to a U.S. State Department Report, Maduro conducted an unlawful election from which he excluded his leading opponents, and then refused to leave office, claiming he had been re-elected.  Dkt. 151 ¶ 39.

Assembly. *Id.* ¶¶ 30-33, 36-38. When mass protests erupted in response, Maduro declared his intentions: "We will go into combat. We will never surrender. What could not be done with votes, we will do with arms. We will liberate our nation with arms." *Id.* ¶ 34.

In May 2018, as Maduro's lawful term as president neared its expiration, he called a snap presidential election that excluded leading opponents. *Id.* ¶ 39; Declaration of Carlos Sarmiento-Sosa ¶ 87 (Dkt. 133) ("Sosa I Decl."); 12/12/23 Trial Tr. 98:14-17. This led the National Assembly to invoke the Venezuelan constitution and initiate Guaidó's caretaker presidency until democratic elections could be held. Dkt. 151 ¶¶ 42-43. U.S. sanctions against Maduro followed. *Id.* ¶¶ 47-49; 12/12/23 Trial Tr. 110:23-112:1.

Maduro then escalated his use of military force and intimidation—including killings at Guaidó's public inauguration, physical attacks on the legislature and its deputies, and attacks on aid initiatives organized by the lawful government—to deprive the new president of his constitutional authority. 12/12/23 Trial Tr. 103:1-106:3. Maduro also began to detain or seize vessels and their cargoes in Venezuelan waters, including cargoes of petroleum products from at least two other CITGO-

5

chartered vessels, in response to U.S. sanctions. Dkt. 151 ¶ 50. The Gerd was among the vessels detained.

### 3. The Thirteen-Month Standoff Over the Cargo, and Its Seizure.

After the Cargo was loaded onto the Gerd, the ship's master requested routine clearances to depart Venezuelan waters. *Id.* ¶¶ 11-13. The port authorities, controlled by Maduro's in-country PDVSA representatives, ignored these requests. *Id.* ¶¶ 52, 57; Dkt. 80 ¶¶ 4, 6. Over the following thirteen months, military personnel and individuals purporting to be PDVSA representatives repeatedly sought to coerce the ship's masters (who served on a rotating basis) to surrender the Cargo. *Id.* ¶¶ 66-70, 77-80; Court of Appeals Dkt. ("CoA Dkt.") 42.1[2] at 27-28, 63-64, 156-170. The port authorities ignored requests from the masters of the Gerd to resupply the vessel with bunker fuel (Dkt. 80 ¶ 6), which was necessary to ensure the vessel would not founder or explode through lack of power to its safety systems. CoA Dkt. 42.1 at 146, 155. An armed military vessel, the Cormoran, shadowed the Gerd and participated in

---

[2] These citations are to the exhibits to CITGO's motion to supplement the record, which the Court granted (CoA Dkt. 44.1). Pincites are to the docket-stamped pagination of such motion papers.

6

repeated boardings by Maduro-controlled military personnel and in-country PDVSA representatives. *Id.* at 139-41; Dkt. 80 ¶ 7. The masters, who took orders from their charterer, CITGO, refused to comply with demands to surrender the Cargo, but would not leave Venezuelan waters without clearance, resulting in a thirteen-month standoff. Dkt. 151 ¶¶ 52-54.

Meanwhile, Interim President Guaidó appointed a new Managing Board for PDVSA, which, through subsidiaries, appointed a new CITGO board. *Id.* ¶ 58. But the legacy boards of PDVSA and CITGO, appointed by Maduro, refused to cede control. *Id.* ¶ 67. The Delaware Chancery Court ultimately resolved that dispute, holding that—because the executive branch of the U.S. Government recognizes the Guaidó government and does not recognize Maduro—U.S. courts are bound to accept the acts of the Guaidó government as legitimate acts of state, and the acts of Maduro are without legal effect. *Jimenez v. Palacios*, 250 A.3d 814 (Del. Ch. 2019), *revised* (Aug. 12, 2019); Dkt. 151 ¶ 59.

There were preliminary email exchanges between CITGO and PDVSA discussing possible return of the Cargo. 12/15/23 Trial Tr. 624:11-632:5. Because such an action would have violated U.S. sanctions

by conferring a benefit on PDVSA, particularly after CITGO had paid for the Cargo, CITGO determined that it could not return the Cargo to PDVSA. 12/14/23 Trial Tr. 451:13-453:16.

On August 30, 2019, the Venezuelan Procurador Especial (attorney general), lawfully appointed by Interim President Guaidó, issued a directive confirming CITGO's title to the Cargo, ordering that the Gerd be permitted to depart, instructing Venezuelan authorities to facilitate that departure, and warning that noncompliance with these directives would bring legal consequences. Pl.Ex. 101 (Directive); Dkt. 151 ¶ 65. Notwithstanding, the Maduro-controlled authorities in Venezuela remained unresponsive to the Gerd's requests for clearance, and the Maduro regime's attempts to force the discharge of CITGO's Cargo continued. Dkt. 151 ¶¶ 66-68, 70-71, 77-80.

On February 9, 2020—after more than a year-long standoff—the Cormoran, with a mounted machine gun, and a second vessel approached the Gerd. *Id.* ¶ 78. Armed military personnel and holdover personnel from the old Maduro-controlled PDVSA boarded the Gerd and threatened its master with enforcement of an alleged criminal court order against him, personally, if he failed to yield the Cargo. CoA Dkt. 42.1 at 96-97.

8

The order did not mention CITGO or any commercial dispute concerning ownership of the Cargo. Def.Ex. RR. These forces compelled the Gerd to sail into port, where the Cargo was seized and permanently lost to CITGO. CoA Dkt. 42.1 at 63-64; Dkt. 151 ¶¶ 79-81. The master testified that he surrendered the Cargo "unwillingly" and, when pressed by the Reinsurers' counsel on the size of the Cormoran, testified that "size is irrelevant once you have got a machine gun …." CoA Dkt. 42.1 at 63-64, 104. The master issued a letter stating that he complied with this compulsion under protest. Dkt. 151 ¶ 79.

### 4. The Insurance Policy

CITGO's claim arises under a Marine Cargo Reinsurance policy issued by the Defendant Reinsurers. *Id.* ¶ 3; Pl.Exs. 2 & 3 (Dkt. 75.1 & 75.2) (the "Policy"). The Policy comprises multiple parts, which are properly viewed as separate collections of clauses (or modules) that fit together to provide comprehensive coverage for most types of loss likely to impact marine cargo. As relevant here, CITGO's Policy contains a form titled the "Institute Cargo Clauses," which provides coverage for marine cargo losses generally, but specifically excludes certain war risks. Pl.Ex. 3 (Dkt. 75.2) at 4 of 12. However, war risks are added back and expressly

9

covered by a separate form titled the "Institute War Clauses." The Institute War Clauses provide:

> This insurance covers . . . loss of or damage to the subject-matter insured caused by
>
> 1.1 war civil war revolution rebellion **insurrection, or civil strife arising therefrom**, or any hostile act by or against a belligerent power
>
> 1.2 capture **seizure** arrest restraint or detainment, **arising from the risks covered under 1.1. above**, and the consequences thereof or any attempt thereat

Dkt. 151 ¶ 6 (emphasis added).

## B. <u>Relevant Procedural History and Rulings Presented for Review.</u>

The parties cross-moved for summary judgment on March 14, 2022, and CITGO also moved the District Court to take judicial notice of certain facts. Dkt. 123, 134, 136. The motions were fully briefed and supported by Rule 56.1 statements and exhibits. Dkt. 123-142, 144-157. On November 23, 2022, the District Court *sua sponte* ordered additional briefing to address "the historical development and meaning" of the term "insurrection" as used in marine cargo insurance. Dkt. 167 at 1. CITGO's submissions in response reflected the historical development and meaning of the clauses. Dkt. 170, 172. CITGO's submissions showed that the term "insurrection" did not appear in the Institute War Clauses

until more than a century after their origin, and explained the historical developments leading to the use of that term. Dkt. 170 at 3-9, Dkt. 172 ¶¶ 5-26. CITGO questioned the utility of the exercise (Dkt. 170 at 1)[3] and observed that while English cases concerning language used in the Institute War Clauses were relevant to their development, the contract in this case is subject, by agreement, to New York law (*id.* at 3 n.2). Accordingly, CITGO referenced English decisions for their explanatory value, but not as relevant precedents. *Id.*

On March 15, 2023, the District Court granted CITGO's summary judgment motion in part and denied it in part, ruling that (1) on the undisputed facts, CITGO had established as a matter of law that the Maduro regime's use of force to prevent Guaidó and the National Assembly from exercising lawful power constituted an insurrection within the scope of the Policy, and (2) CITGO was the lawful owner of the Cargo, having received it free on board its chartered vessel in accordance with governing contracts. Dkt. 182. The District Court declined to grant summary judgment to CITGO on the standard of causation applicable to

---

[3] "Information about the historical development and meaning of 'insurrection' is scarce, and may not shed much light on the parties' mutual intention here." *Id.*

CITGO's loss under the Policy. *Id.* The court granted in part and denied in part CITGO's motion for judicial notice. *Id.* The court denied the Reinsurers' cross-motion for summary judgment on the issue of insurrection. *Id.*

The District Court found the effect of the Policy term "insurrection" ambiguous as applied to the facts of this case. *Id.* at 23. The court sought to resolve that ambiguity by reference to this Court's opinion in *Pan Am. World Airways v. Aetna Cas. & Sur. Co.*, 505 F.2d 989 (2d Cir. 1974), but concluded that *Pan Am* did not resolve the ambiguity where, as here, an outgoing regime seeks to displace the authority of the newly-constituted government. *Id.* at 23 n.9.

The District Court did not "draw all factual inferences in favor of CITGO," as the Reinsurers contend. Appellants' Opening Br. ("Br.") at 12, 14. As is required on summary judgment (Fed.R.Civ.P. 56.1), the District Court accepted as true those statements of material fact that were not in dispute. Dkt. 151. It reached legal conclusions based on those facts. The District Court properly took judicial notice of the U.S. Government's recognition of the Guaidó government, Dkt. 182 at 14, which is legally binding on the courts.

Likewise, in granting in part CITGO's second motion for judicial notice before trial (Dkt. 207; *see also* Dkt. 208, 218, 222), the court accepted only facts that were not reasonably in dispute. Dkt. 238.

The District Court later determined as a matter of law, after full briefing and consideration of foreign law affidavits under Federal Rule of Civil Procedure 44.1, that the Venezuelan constitution established the beginning of Guaidó's interim presidency on January 10, 2019. 12/12/23 Trial Tr. 29:4-36:3. The jury was instructed accordingly. *Id.* at 871:25-872:6.

Trial was held before a jury of eight from December 12-18, 2023. CITGO presented evidence of violent acts by the Maduro regime against the National Assembly, the Guaidó interim government, and their supporters and initiatives. *See supra* pages 4-5. CITGO proved, in painstaking detail, the value of the Cargo and that CITGO had paid for it in kind in accordance with preexisting agreements with PDVSA, including agreements concerning the specific cargos of crude oil, refined products, and services exchanged in the transaction. 12/14/23 Trial Tr. 466:24-493:11, 495:15-506:21. The Reinsurers sought to elicit evidence on cross-examination purporting to show that the loss of the Cargo

resulted from a commercial dispute between CITGO and PDVSA, allegedly arising from CITGO's purported non-payment for the Cargo because of U.S. sanctions against PDVSA. *See, e.g.*, 12/13/23 Trial Tr. 363:1-389:20. In returning its verdict in CITGO's favor (Dkt. 275), the jury necessarily concluded that the cause of CITGO's loss was a seizure arising from an insurrection. Judgment was entered for CITGO on December 28, 2023 (Dkt. 290).

## SUMMARY OF ARGUMENT

Reinsurers' scattershot assignments of error boil down to three arguments: (1) the District Court erred in granting summary judgment based on undisputed facts that the political events in Venezuela constituted an "insurrection"; (2) the District Court abused its discretion by judicially noticing certain facts that were cited in that ruling and other pretrial rulings; and (3) the District Court incorrectly instructed the jury on the causation standard written into the Policy. All three of these arguments are wrong, and crucial parts of them have been waived.

First, the District Court correctly held, based on undisputed facts, that Maduro's use of violence and intimidation to displace the authority of Venezuela's legally-constituted government was "insurrection" within

the meaning of the marine cargo insurance Policy. That conclusion followed inexorably from Reinsurers' own admissions of fact, the U.S. government's recognition of Interim President Guaidó and the National Assembly as the lawful government of Venezuela, this Court's prior decisions addressing the policy term "insurrection," and applicable rules of insurance policy construction.

Indeed, contrary to Reinsurers' argument that the District Court erroneously drew factual inferences in CITGO's favor, Reinsurers conceded the material facts the District Court relied on—namely, that Maduro, whose lawful term had expired, used violence against the incoming U.S.-recognized government and its supporters, and had stated his intent to usurp governmental authority he could not win with votes. Like this Court in *Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 1017 (2d Cir. 1974), the District Court found the undefined term "insurrection" ambiguous and concluded that the caselaw did not resolve its application to the unique fact pattern presented. The court then properly applied the principle of *contra proferentem*—construing an ambiguous policy term against the insurer—to resolve the ambiguity in favor of coverage.

15

Reinsurers contend that the term "insurrection" is not ambiguous because this Court determined its meaning in *Pan Am*. But construing a contract requires determining its application to specific facts. Thus, courts often find the same policy terms clear in one setting and ambiguous in another. The holding in *Pan Am* did not resolve the ambiguity of "insurrection" as applied to the unique facts of this case.

Reinsurers also argue that, for purposes of construing the "insurrection" language of the marine cargo Policy, what matters is whether the government under attack holds *de facto* power, not *de jure* power. But this argument is not supported by this Court's prior holdings, which require insurrection against the "lawfully constituted" government. As the District Court correctly held, the U.S. executive branch's recognition of Interim President Guaidó and the National Assembly as the sole legitimate government of Venezuela is binding on the courts. Reinsurers' attempt to manufacture a distinction that allows such recognition to be binding for matters of public international law but not matters of private law collides with age-old Supreme Court precedent as well as more recent cases involving the Guaidó government itself.

16

Reinsurers' arguments that the Guaidó government exercised no power and that the insurrection was accompanied by no violence are also factually incorrect. Reinsurers ignore evidence of the lawfully constituted government's control over foreign embassies and extensive foreign assets (including CITGO) and enactment of legislation and ministerial orders. The jury also was presented with affidavits and trial testimony describing physical attacks on Interim President Guaidó, on the National Assembly in its chamber, on the legally-constituted government's initiatives, and on its supporters. The jury also heard that CITGO's chartered vessel discharged its Cargo under protest, under the guns of a Maduro-controlled naval gunship, after the Gerd was boarded by armed military personnel loyal to Maduro. The jury considered this evidence and the verdict reflects their conclusion.

Finally with respect to the "insurrection" issue, the District Court's determination as a matter of foreign law that the inception of Guaidó's interim presidency was on January 10, 2019, was proper under Federal Rule of Civil Procedure 44.1. Reinsurers did not offer an alternative date, but instead recycled their already-rejected argument that Guaidó never became president at all. The court had the benefit of declarations from a

17

Venezuelan lawyer supporting the Guaidó government and a Venezuelan lawyer supporting the Maduro regime. Venezuela's constitution establishes that a six-year presidential term ends on January 10, and if a president is unavailable to take office at the start of a new presidential term, the president of the National Assembly shall "take charge" of the Presidency of the Republic until new elections are held. After Maduro organized a sham election that excluded his key opponents, the National Assembly declared the 2018 election invalid and invoked the constitution to commence the interim presidency of Juan Guaidó. The recognition of the Guaidó presidency by the U.S. executive branch compelled the District Court's conclusion that Guaidó's term began on January 10, 2019, by operation of the Venezuelan constitution.

Second, the District Court properly took judicial notice of certain facts, despite Reinsurers' claims to the contrary. Reinsurers fail to identify any genuine dispute concerning the facts judicially noticed. Indeed, the only material fact Reinsurers cite as being in controversy—Maduro's use of force to interdict an aid convoy arranged by the Guaidó government—is one they expressly admitted. They identify no prejudice they suffered from any fact noticed by the District Court. The specific

governmental reports noted—State Department Reports, Congressional Research Service Reports, and U.N. Reports—are of a kind this and other courts have routinely recognized as reliable.

Third, the District Court applied the correct standard of causation to the operative phrase "arising from" used in the Policy. Reinsurers incorrectly argue that the court should have applied a proximate cause standard derived from general marine insurance principles, based on language different from that used in CITGO's Policy, construed in cases not applying New York law. However, the Policy Reinsurers sold CITGO has a New York choice-of-law clause and uses the words "arising from," which a string of New York insurance cases interpret to mean "originating from, incident to, or having connection with," and to require "only that there be some causal relation between the injury and the risk for which coverage is provided." *E.g., Maroney v. N.Y. Cent. Mut. Fire Ins. Co.*, 5 N.Y.3d 467, 472 (2005).

Reinsurers' attempt to distinguish *Maroney* (and ignore the other cases CITGO cited in the District Court) because they are not marine cargo cases is unavailing. There is no basis in New York law to read the standard insurance phrase "arising from" differently based on the type of

19

policy in which it appears. Moreover, even the cases Reinsurers cite underscore that parties are free to choose different policy language to effect a different causation standard, exactly as the parties did here. The District Court properly recognized Reinsurers' failure to provide positive authority for their preferred proximate cause standard under governing New York law.

Finally, Reinsurers expressly withdrew their proximate cause argument and chose not to reinstate it at trial or by post-trial motion, notwithstanding the District Court's express invitation to do so.

## ARGUMENT

### I. THE DISTRICT COURT CORRECTLY DECIDED THE ISSUE OF COVERAGE FOR "INSURRECTION" ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT.

#### A. The District Court Correctly Determined that the Ambiguous Grant of Coverage under the Institute War Clauses Must Be Construed in Favor of Coverage.

On summary judgment, both parties asked the District Court to decide, as a matter of law, whether Maduro's attempts, by violence and intimidation, to displace the lawful National Assembly and the caretaker Guaidó government constituted an "insurrection" within the Policy's grant of coverage in the Institute War Clauses. The parties agreed to the material underlying facts: that "Mr. Maduro and his supporters used

20

violence to suppress Mr. Guaidó and his allies," and that "Mr. Maduro intended to aggregate power for himself, at the expense of opposition forces." Dkt. 182 at 21 n.8 (citing facts conceded in Reinsurers' response to CITGO's Rule 56.1 statement). The parties likewise agreed that the term "insurrection," undefined in the Policy, was subject to this Court's *Pan Am* analysis: "the word insurrection means '(1) a violent uprising by a group or movement (2) acting for the specific purpose of overthrowing the constituted government and seizing its powers.'" Dkt. 182 at 17 (quoting *Pan Am*, 505 F.2d at 1017). Nevertheless, the parties disputed whether Maduro's actions satisfied the Policy's grant of coverage for "insurrection."

To answer that question, the District Court correctly applied bedrock New York law. When a policy "on its face is reasonably susceptible of only one meaning," such unambiguous policy provisions must be given that "plain and ordinary meaning." *Selective Ins. Co. of Am. v. Cnty. of Rensselaer*, 26 N.Y.3d 649, 655 (2016). But where there is a "reasonable basis for a difference of opinion as to the meaning of the policy," the policy is "deemed to be ambiguous" and must be construed, under the principle of *contra proferentem*, against the insurer and in

favor of coverage. *Id.* at 656.[4] Following these rules, the District Court concluded that "the meaning of 'insurrection' in the Policy is ambiguous revealed in the light of this case's unique facts," requiring the court to construe that ambiguity in CITGO's favor and hold that Maduro's acts constituted an "insurrection" within the meaning of the Institute War Clauses. Dkt. 182 at 17, 25.

On appeal, Reinsurers argue—without authority—that without "ambiguity in the meanings of the words as they are actually used in an insurance contract, ***derived from construction of the words themselves as used in the contract***, there can be no finding that the contract is ambiguous." Br. at 23 (emphasis in original).

That is entirely at odds with the actual rules of construction. The question is whether application of the Policy's terms to the facts of the case created ambiguity. The District Court properly found it did.

Reinsurers confuse policy interpretation with policy construction:

Through "interpretation" of a contract, a court determines what meanings the parties, when contracting, gave to the

---

[4] New York law allows a court to consider "extrinsic evidence as an aid in construction" before applying *contra proferentem* to resolve ambiguity against an insurer. *See, e.g.*, *State v. Home Indem. Co.*, 66 N.Y.2d 669, 671 (1985). But Reinsurers offered no extrinsic evidence in support of their interpretation. *See* Dkt. 182 at 23-25.

> language used. Through "construction" of a contract, a court determines the legal operation of the contract—its effect upon the rights and duties of the parties. In accordance with this distinction, the construction of a contract begins with the interpretation of its language but does not end with it, while the process of interpretation stops wholly short of a determination of the legal relations of the parties.

5 Corbin on Contracts § 24.3. Thus, construction is used to resolve uncertainty about how particular interpreted words apply to specific facts. Rules of construction, such as *contra proferentem*, are used to resolve any ambiguities about the legal effect of the policy terms as applied in a given case.

Indeed, this Court has recognized that "a contract may be ambiguous when applied to one set of facts but not another." *Morgan Stanley Group, Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 278 (2d Cir. 2000); *accord Cont'l Cas. Co. v. Rapid-American Corp.*, 80 N.Y.2d 640, 643 (1993) ("clauses, of course, can be ambiguous in one context and not another"); *York v. Sterling Ins. Co.*, 67 N.Y.2d 823, 825 (1986) (policy meaning "uncertain when applied to the somewhat unusual circumstances of this case"); *cf. King v. Burwell*, 576 U.S. 473, 486 (2015) (in statutory construction, "oftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in

context"). Reinsurers' argument that ambiguity means uncertainty only about the abstract meaning of insurance policy terms—here, "insurrection"—is inconsistent with these holdings.

Coverage disputes often require construction of policy language that is ambiguous as applied to specific facts—particularly when, as here, operative terms are not defined in a policy. Consider standard-form pollution exclusions commonly found in third-party liability insurance. These provisions have been found unambiguous when applied to discharges of industrial waste. *Rapid-American*, 80 N.Y.2d at 652-653. Yet the same clauses have been found ambiguous when applied in other factual scenarios. *See Belt Painting Corp. v. TIG Ins. Co.*, 100 N.Y.2d 377, 387-388 (2003) (paint fumes); *Westview Assoc. v. Guar. Nat'l Ins. Co.*, 95 N.Y.2d 334, 339-340 (2000) (lead paint); *Rapid-American*, 80 N.Y.2d at 652-656 (asbestos fiber). In each case, ambiguity required a court to construe the policy in favor of coverage and against the insurer. *Belt Painting*, 100 N.Y.2d at 388; *Westview*, 95 N.Y.2d at 340; *see Rapid-American*, 80 N.Y.2d at 665 (language "ambiguous in these circumstances" construed against insurer and in favor of coverage).

Ambiguity can arise even when interpreting policy language that previously received judicial interpretation. For example, following the September 11 attacks on the World Trade Center, the extent of insurance coverage turned on whether the attacks constituted one or two "occurrences." *See generally World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154 (2d Cir. 2003), *abrogated on other grounds by Wachovia Bank v. Schmidt*, 546 U.S. 303 (2006). The insurers contended the meaning of "occurrence" was unambiguous because of "well established New York precedent" interpreting the term. *Id.* at 186-90. This Court rejected that argument: "[A] contract may be ambiguous when applied to one set of facts but not another. Therefore, ambiguity is detected claim by claim." *Id.* at 184 (quoting *Morgan Stanley Group Inc. v. New England Ins. Co.*, 225 F.3f 270, 275 (2d Cir. 2000)). Because the judicial definition of "occurrence" was susceptible to reasonable alternative meanings as applied to the September 11 attacks, this Court held the term ambiguous in that particular context. *Id.* at 188-89.[5]

---

[5] The *World Trade Center* court ultimately did not apply *contra proferentem* because extrinsic evidence was available and would be submitted to the jury. *Id.* As noted above, no extrinsic evidence was raised in this case. *See* note 3, *supra*.

The District Court's decision fully accords with this precedent. Lacking a policy definition of the term "insurrection," both parties and the District Court turned to the definition adopted by this Court in *Pan Am*. But that definition did not resolve the ambiguous application of the term "insurrection" to the facts of this case. *See* Dkt. 182 at 17 ("[T]he Court holds that the meaning of 'insurrection' in the Policy is ambiguous revealed in the light of this case's unique facts."); *id.* at 21 ("[A]n ordinary person could read the *Pan Am* definition and reasonably agree with either party about whether an insurrection occurred in Venezuela after January 2019."). In the absence of extrinsic evidence, the Court therefore correctly applied *contra proferentem*.

Far from repudiating *Pan Am*, as the Reinsurers suggest, the District Court followed in its footsteps. The *Pan Am* court discussed *contra proferentem* at length, explaining that the relevant insurers could prevail only if they demonstrated that theirs was "the only reasonable reading" of the war risks exclusion at issue. *See* 505 F.2d at 999-1004. Although those insurers insisted that the war risks were not "legally ambiguous" because they had been "judicially defined," this Court disagreed, recognizing that terms "such as '*insurrection*,' 'rebellion' and

26

'civil commotion' have received little of the clear judicial construction"
needed to eliminate their inherent ambiguity. *Id.* at 1001 (emphasis
added). Rather, because those terms were amenable to several plausible
readings, the Court applied *contra proferentem* and construed
"insurrection" in favor of coverage. *Id.* at 1001-02.[6] Subsequent
"insurrection" cases have followed suit. *See, e.g.*, *Holiday Inns Inc. v.
Aetna Ins. Co.*, 571 F. Supp. 1460, 1463-64 (S.D.N.Y. 1983) (reiterating
*Pan Am* holding that *contra proferentem* applies).

Reinsurers' contrary arguments fail. First, they claim that the *Pan
Am* court "did not find the term 'insurrection' to be ambiguous at all," nor
has any other court interpreting the term "insurrection." Br. at 23. This
is simply wrong: the *Pan Am* court expressly rejected the argument that
"insurrection" was "legally unambiguous." 505 F.2d at 1001-02.[7]

---

[6] In *Pan Am*, "insurrection" and the other war risks were used in a policy
*exclusion*, so construing them more narrowly favored coverage. Here,
the war risks are used in a *grant of coverage*, so construing them more
broadly favors coverage.

[7] Reinsurers point out that *Pan Am* cited the First Circuit's 1954 decision
in *Home Insurance Co. v. Davila*, 212 F.2d 731 (1st Cir. 1954), as the
source for its definition of insurrection. Br. at 23. But *Davila* was part
of the caselaw the *Pan Am* court found offered "little of the clear judicial
construction" required to eliminate ambiguity. *See* 505 F.2d at 1001.

27

Second, Reinsurers accuse the District Court of finding ambiguity in the words the *Pan Am* court used to define "insurrection," not in the Policy term "insurrection" itself. Br. at 24. But there can be no mistaking that the District Court found the term "insurrection" in the Policy ambiguous as applied to the facts in this case. The District Court repeated that determination no fewer than eight times. Dkt. 182 at 1-2, 16, 17, 20, 21, 23, 24, 25. The District Court simply found that the definition provided in *Pan Am*, explained in terms of "uprising" and "overthrow," did not resolve the ambiguous application of the word "insurrection" to the facts of this case.

The best Reinsurers can muster is an argument based on the second half of one sentence in the District Court's opinion. Reinsurers observe that the District Court misdescribed the terms "uprising" and "overthrow" as "words of the Policy" rather than the words of *Pan Am*. Br. at 24 (citing Dkt. 182 at 25). This was infelicitous phrasing, but the opinion makes clear that the District Court had no misunderstanding about the actual wording of the Policy. Given the number of times the District Court stated that the term "insurrection" was ambiguous—and its repeated attribution of the words "uprising" and "overthrow" to the

28

"*Pan Am* definition" (Dkt. 182 at 19, 20, 21, 22, 25, 26), not the policy—there is no room to doubt the court's intention was to show that the *Pan Am* definition did not resolve the ambiguity of the term "insurrection" as applied to this dispute.

Finally, Reinsurers argue that, because the terms "uprising" or "overthrow" do not appear in the Policy's text, the District Court erred in analyzing whether they resolved the ambiguity of the term "insurrection." But Reinsurers cannot argue *both* that the *Pan Am* definition applies *and* that the District Court committed error by endeavoring to apply that definition to the facts of this case. The District Court was correct to consider whether this Court's definition of the terms provided clarity on these facts.[8]

As a result, none of Reinsurers' arguments against the application of *contra proferentem* defeats its proper application by the District Court.

---

[8] Ironically, Reinsurers also complain that the District Court's opinion contains "no analysis or explanation" of how the terms "uprising" or "overthrow" could be ambiguous. Br. at 25. Not true. This analysis appears on pages 20-22 of the District Court's opinion. There, the District Court discussed the implications of those terms at length, considered alternative dictionary definitions, and ultimately concluded that these terms from the *Pan Am* definition did not help resolve how "insurrection" should apply to the facts of this case.

CITGO's Policy does not define "insurrection," and neither the Policy nor *Pan Am* eliminate the ambiguity of that term as applied to the specific facts of this case. Nor did the Reinsurers submit any probative extrinsic evidence that warranted submission to the jury. *Home Indem. Co.*, 66 N.Y.2d at 671 (if "tendered extrinsic evidence … will not resolve the equivocality of the language of the contract, the issue remains a question of law for the court."); Dkt. 182 at 25 (citing *Home Indemnity* and finding the absence of extrinsic evidence to be dispositive). Therefore, the District Court correctly determined that application of the term was ambiguous and construed it in CITGO's favor as a matter of law.

## B. The District Court Correctly Determined that there Was an Insurrection Triggering Coverage under the Policy.

This Court explained in *Pan Am* that an insurrection is "(1) a violent uprising by a group or movement (2) acting for the specific purpose of overthrowing the constituted government and seizing its powers." 505 F.2d at 1017. Here, the District Court properly found both that Maduro sought to overthrow the lawfully constituted government of Venezuela, and that he did so with violence. Reinsurers' contrary arguments are unavailing.

30

### 1. The District Court Correctly Determined that the Guaidó Government Was the Lawfully Constituted Government.

"[F]or there to be an insurrection," this Court explained in *Pan Am*, "there must be an intent to overthrow a *lawfully constituted* regime." *Id.* at 1005 (emphasis added). The "constituted government" is the "government constituted in accordance with the constitution. … [I]t's the legitimate government." Dkt. No. 154.1 (Dep. Tr. of Prof. H. Koh) at 40:6-8; *see also Holiday Inns* 571 F. Supp. at 1488 (no insurrection where groups were not "attempting to overthrow [] the *constitutionally structured government*") (emphasis added). In short, the "constituted government" is the *de jure* government—the one holding lawful authority—regardless of who exercises *de facto* power.

At all times relevant to this appeal, the United States executive branch recognized Guaidó and the National Assembly as the legitimate government of Venezuela, and "d[id] not recognize the Maduro regime as the government of Venezuela." Dkt No. 127.23. That executive determination is binding on United States courts: the District Court was not free to disagree and decide that Maduro, not Guaidó, led the "constituted government" of Venezuela.

31

Remarkably, Reinsurers accuse the District Court of having "invented 'the recognition doctrine.'" Br. at 38. The accusation is ludicrous. In a footnote, they go further, contending that "[t]here is no authority for the proposition that an Article III Court is precluded from taking a position on the legality of a foreign government as a matter of its own internal laws simply because it might be said to contradict a previously-held position of the executive branch." *Id.* at 33 n.4. There is, in fact, overwhelming binding authority for that proposition, and the District Court cited it. Dkt. 182 at 18 (collecting cases); 12/12/23 Trial Tr. 29:5-31:19. Reinsurers' argument is nothing more than an invitation to this Court to defy a long line of Supreme Court precedent.[9]

"[T]he Nation must have a single policy regarding which governments are legitimate in the eyes of the United States and which are not." *Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015). As the District Court

---

[9] A similar failure to acknowledge binding authority drew the District Court's rebuke at trial, prompting Reinsurers to withdraw their objections concerning the causation standard: "Counsel [for Defendants], …. You can't just make up stuff. That is not good lawyering. If you don't have a case that stands for your position and you don't have a nonfrivolous basis to make an argument, I question whether or not you are complying with your ethical responsibilities …. We expect more." 12/14/23 Trial Tr. 607:16-608:2.

recognized, this "well-settled" rule means "the United States president enjoys the 'exclusive' power to 'recognize foreign governments.'" Dkt. 182 at 18 (quoting *Zivotofsky*, 576 U.S. at 17). The executive's recognition of a foreign government "'conclusively binds' the judiciary." *Id.* at 18 (quoting *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918)); *see also United States v. Palmer*, 16 U.S. 610, 643 (1818) ("[T]he courts of the union must view [a] newly constituted government as it is viewed by the legislative and executive departments of the government of the United States.").

The pedigree of this doctrine dates back centuries, including a Supreme Court marine insurance case with parallels to this one:

> [I]t is not material to inquire, nor is it the province of the Court to determine, whether the executive be right or wrong. It is enough to know, that in the exercise of his constitutional functions, he has decided the question. …

> If this were not the rule, cases might often arise in which, on the most important questions of foreign jurisdiction, there would be an irreconcilable difference between the executive and judicial departments. … No well-regulated government has ever sanctioned a principle so unwise, and so destructive of national character.

*Williams v. Suffolk Ins. Co.*, 38 U.S. 415, 420 (1839).

For all these reasons, the District Court properly concluded that it was required to "treat Mr. Guaidó—not Mr. Maduro—as 'the constituted government' of Venezuela" at the time the Cargo was seized. Dkt. 182 at 19. All U.S. courts to consider the issue have recognized Guaidó's government as the constituted government of Venezuela during his interim presidency. *E.g.*, *Rusoro Mining Ltd. v. Bolivarian Republic of Venez.*, 2019 U.S. App. LEXIS 17543, at *1-2 (D.C. Cir. May 1, 2019) (citing U.S. recognition of Guaidó government to deny Maduro parties' motion to bar counsel appointed by Guaidó from representing Venezuela in litigation); *Caballero v. Fuerzas Armadas Revolucionarias de Colombia* No. 20-MC-40-LJV, 2021 WL 1884110, at *6-8 (W.D.N.Y. May 11, 2021) (court bound to apply executive recognition of Guaidó government regardless of *de facto* control); *Casa Express Corp. v. Bolivarian Republic of Venezuela*, 492 F. Supp. 3d 222, 226 (S.D.N.Y. 2020) (executive recognition of Guaidó "is binding on this Court"); *Jimenez v. Palacios*, 250 A.3d 814, 820 (Del. Ch. 2019), *as revised* (Aug. 12, 2019), *aff'd,* 237 A.3d 68 (Del. 2020) ("[T]his decision accepts as binding the U.S. President's recognition of the Guaidó government and [therefore] assumes the validity of the Guaidó government's

34

appointments to the PDVSA board," disregarding Maduro's board appointments).  Reinsurers cite no contrary authority.

Seeking to circumvent these precedents, Reinsurers argue, without citation to any U.S. authority, that the executive's determinations are "significant" only for purposes of "public international law" and have no bearing on the "terms of a private law insurance contract" like the Policy at issue here.  Br. at 38.[10]  There is no basis for this distinction, and it is simply wrong.

The Supreme Court's *Williams* decision, quoted above, was itself an action on a "private law insurance contract" covering marine risks. *Williams* arose from the seizure of an insured vessel and cargo in the Falkland (or Malvinas) Islands by the government of "Buenos Ayres." 38 U.S. at 415-16.  Buenos Ayres claimed sovereignty over the islands and

---

[10] Reinsurers cite a single British case in alleged support of this argument, but they rely on their expert's selective quotation of that authority rather than the decision itself.  Br. at 38 (referring to *Spinney's (1948) Ltd. v Royal Ins. Co. Ltd.* [1980] 1 Lloyd's Rep. 406, 426).  In fact, the case supports the opposite conclusion: "There are, of course, well-recognized situations in which it is the practice of this Court to consult with the Secretary of State, and upon which his response is treated as conclusive. … Such cases include those where the issue is whether the United Kingdom recognises a person as a foreign sovereign …."  Dkt. No. 172.16, *Spinney's* at 426.

seized the vessel on that basis; the U.S. government disputed that claim of sovereignty. *Id.* at 416-17. The insurer denied coverage for the loss, contending that the vessel's unauthorized fishing in Buenos Ayres' sovereign territory was "an illicit and prohibited trading within [the meaning of] the policy" that absolved the insurer of liability. *Id.* at 418.

The Supreme Court held in favor of the policyholder, reasoning that the U.S. government's position that Buenos Ayres had no sovereignty over the Falklands was binding on the judiciary. *Id.* at 420. The Court declined to second-guess the President and make its own determination whether Buenos Ayres had sovereignty over the Falklands under principles of international law. And the Court did not parse whether sovereignty existed for purposes of a "private law insurance contract," on the one hand, and "public international law," on the other—the paradigm that Reinsurers urge here without support. The President's determination was binding for all judicial purposes, and as a direct result, "the seizure and condemnation of the [vessel] was a loss for which the plaintiff [was] entitled to recover in this case." *Id.* at 422.

Just so here. Where the question whether there was an "insurrection" turns on who leads the "constituted government," the

executive branch's determination of the latter question must be accepted as binding before reaching the former. Any other course would create the risk of "an irreconcilable difference between the executive and judicial departments." *Id.* at 420.

Reinsurers further overreach in contending the Guaidó government never exercised *de facto* power. Br. at 33. As the District Court correctly recognized, the Guaidó government wielded significant governmental power, including the power to appoint the Board of PDVSA (and indirectly, CITGO); control over Venezuelan embassies in many nations, including the United States; and control over Venezuela's extensive foreign assets. Dkt. 182 at 20 n.6; 12/12/23 Trial Tr. 104:24-105:3. The National Assembly continued to enact legislation; Guaidó government ministers issued orders; and some members of the army attempted to defend the legitimate government. Dkt. 242 ¶ 6 (describing National Assembly's enactment of transition statute); Dkt. 191 (directive of Guaidó's Procurador Especial); 12/12/23 Trial Tr. 105:21-23 (military who supported Guaidó were "shot, and some of them to death"). Had Maduro not acted with force against the Guaidó government, there is no reason to doubt all government instrumentalities would have followed its orders.

37

Reinsurers therefore are mistaken in arguing that the District Court's summary judgment order was "internally and fatally inconsistent." Br. at 36. To the contrary, the District Court recognized that whether the Guaidó government's powers were "the kind of powers that can be 'seized' under the *Pan Am* definition" was "an issue that can reasonably be disputed." Dkt. 182 at 20, n.6. But, as the District Court correctly concluded, the fact that reasonable minds could differ on this issue merely confirms that the *Pan Am* definition of "insurrection" is ambiguous as applied to these circumstances. *Id.*

And because the District Court was required to treat the Guaidó government as the "constituted government" of Venezuela, it also was required to recognize the Guaidó government's acts as official acts of state. *Jimenez*, 250 A.3d at 832 ("Recognition of Guaidó's government has significant consequences in this litigation because foreign sovereigns are entitled to the benefits of the act of state doctrine."). This means the District Court was required to presume the validity of the order of Guaidó's Attorney General, which "ordered that the Gerd be allowed to depart with the cargo." Dkt. 182 at 6. The fact that the Cargo was subsequently seized at the barrel of a gun, in open defiance of that lawful

governmental order, is further evidence supporting the District Court's finding of insurrection.

### 2. The District Court Correctly Determined that Maduro Sought to Remove the Lawful Government with Violence.

Reinsurers avoid reference to evidence of the violence of the insurrection, both generally and as deployed against the Gerd. They also avoid reference to their own admissions concerning the purposes for which the Maduro regime deployed that violence. Instead, they seek to focus on the theme that Maduro could not have sought to overthrow the Guaidó government because (they contend) Guaidó did not have a government to lead. That argument is disposed of above.

The District Court's recognition of the lawfully-constituted Guaidó government likewise disposes of Reinsurers' scattered arguments that the Maduro regime's actions could not have been insurrectionary because, in Reinsurers' view, Maduro did not intend to overthrow a government and seize its powers. *See generally* Br. 26-32, 52-55.

As the District Court observed, Reinsurers' "violence" and "intent" arguments merely repackage their central disagreement regarding the Guaidó government's legitimacy. *See* Dkt. 182 at 21 n.8. Reinsurers

39

argue that Maduro could not have acted with the purpose of "seizing powers" because "[t]he Maduro regime never stopped governing Venezuela; the Guaidó faction never started." Br. at 27. They contend that the Policy does not insure against the "violent or authoritarian acts of a ruling government to maintain its rule" (*id.* at 31-32) and maintain that Maduro's undisputed acts of violence were activities "by the government" rather than "against the government" (*id.* at 32). Each variation of this argument presupposes Maduro did not act to overthrow the government *because* Reinsurers do not accept the Venezuelan government recognized by the United States—a proposition the recognition doctrine forecloses. *See supra* pages 33-38.

Once Reinsurers' strawman argument that Guaidó's government was not legally constituted is brushed aside, the undisputed evidence submitted during summary judgment makes clear that Maduro had the intent to seize Guaidó's powers and used violence to do so. In their response to CITGO's Rule 56.1 Statement, Reinsurers conceded that the Maduro regime repeatedly used violence against its enemies, a pattern which escalated following the Guaidó government's formation. *See, e.g.*, Dkt. 151 at ¶¶ 32, 36-38, 46, 61, 63, 72-74. Reinsurers likewise did not

dispute the declaration of Rosmit Mantilla, a member of Venezuela's National Assembly and former political prisoner of the Maduro regime, who described at length the Maduro regime's violence against the National Assembly and the lawful Guaidó government. *See generally* Dkt. 130; *see also* Dkt. 151 at ¶¶ 32, 36-38, 46, 61, 74-75 (conceding various portions of Mr. Mantilla's testimony). Reinsurers similarly conceded Maduro's publicly declared intent to overthrow the lawful government of Venezuela, to "do with arms" what "could not be done with votes." *See* Dkt. 151 at ¶ 34. Thus, the District Court did not draw "factual inferences" in CITGO's favor; rather, it appropriately credited undisputed evidence to conclude that Maduro and his allies were engaged in an insurrectionary "violent uprising" against the lawful Guaidó government. *See* Dkt. 183 at 3-4, 6-7, 26.

Reinsurers' arguments that Maduro did not deploy violence, or that he did not deploy violence against CITGO's vessel, also are belied not just by the evidence they admitted on summary judgment, but also by the trial, where CITGO presented further evidence of these events and of Maduro's attacks and killings of Guaidó's supporters at his public

inauguration, and of military personnel who supported him. 12/12/23 Trial Tr. 103:1-106:3.

Reinsurers' assertion that the Cargo's seizure under the guns of an armed vessel was not "violence" conflicts with this Court's precedent. In considering a similar use of intimidation, this Court stressed that when insurrectionists "took control … with sufficient display of strength so that every one acquiesced in [their] power … [a] testing of that strength by resistance, even to the point of bloodshed … was surely not necessary." *Pape v. Home Ins. Co.*, 139 F. 2d 231, 234 (2d Cir. 1943).

The cases cited by Reinsurers—*Holiday Inns*, *Davila*, *supra* n.7, and *Pan Am*—offer no support for their argument. Br. at 26-32, 52-55. Reinsurers misread *Holiday Inns* to stand for the proposition that violence in preservation of the "status quo" can never be regarded as insurrectionary. *See* Br. at 31, 54. In *Holiday Inns*, the Lebanese constitution and the "National Pact," entered into when Lebanon gained independence, provided Lebanese Christians with greater governmental power than Muslims. 571 F. Supp. 1460, 1472-73 (S.D.N.Y. 1983). During the 1970s, the "Lebanese Front," a coalition of "predominantly right of center organizations," strove to maintain that constitutional

42

structure in the face of opposition from a coalition of left-of-center organizations, the "National Movement." *Id.* at 1473-74. In analyzing certain violent clashes between these factions, the *Holiday Inns* court concluded that the various right-wing militias were not insurrectionary because they were not attempting to *overthrow* the constitutionally structured government but, rather, were fighting to *preserve* it. *Id.* at 1488. The court's observation that the right-wing factions' "purpose was to preserve a status quo which favored their interests" held true only because, on the facts of that case, the right-wing-supported "status quo" was the existing constitutional structure. *See id.*

*Holiday Inns* is thus inapposite, because unlike the Lebanese government, the Maduro regime was *not* the "constitutionally structured government" of Venezuela. Under the constitutional structure in Venezuela, Maduro's government came to an end on January 10, 2019, after which Guaidó became the interim president. Guaidó's "lawfully constituted" government, within the meaning of *Pan Am* (505 F.22d at

43

1005), was the status quo that Maduro sought to disrupt by violence and intimidation. Thus, *Holiday Inns* offers Reinsurers no legal support.[11]

Reinsurers fare no better with *Davila* and *Pan Am*. From *Davila*, Reinsurers emphasize that insurrection requires an objective to overthrow the government. *See* Br. at 29-30 (citing 212 F.2d 731, 737-738). But *Davila* helps Reinsurers only if the Court ignores the recognition doctrine and accepts Reinsurers' argument that Guaidó did not lead a government. From *Pan Am*, Reinsurers speculate that Maduro may have acted only to "embarrass and discredit" or "strike a symbolic blow" against Guaidó, rather than overthrow his government. *See* Br. at 30-32. Rather than establishing reversible legal error, these arguments appear to challenge the *evidence* demonstrating that the Maduro regime sought to use violence to overthrow the Guaidó government and seize its powers. *See, e.g.*, 31-32 & n.31 (claiming "there is no evidence that any violent or other acts by the Maduro regime" were for insurrectionary

---

[11] Moreover, the policy in *Holiday Inns*, like that in *Pan Am*, *excluded* insurrection. The exclusion was interpreted narrowly in favor of coverage, requiring a narrow construction of "insurrection." *Pan Am*, 505 F.2d at 999; *Holiday Inns*, 571 F. Supp. at 1464. If the policy in *Holiday Inns*, like the policy at issue here, had instead *covered* war risks, the result might have been different.

44

purposes); *see also* Br. at 3 (accusing District Court of "drawing factual inferences" in CITGO's favor). What Reinsurers offer is speculation. Far from drawing inferences, as shown *supra* pages 41-42, the District Court merely credited Maduro's own statement of his intention to "do with arms" what he "could not do with votes"—a fact Reinsurers did not dispute. Dkt. 151 ¶ 34. Moreover, because the District Court's summary judgment order was limited, the jury was specifically called upon to decide whether an insurrection took place in Venezuela "during or prior to January 2019." 12/18/23 Trial Tr. 871:22-24. Reinsurers did not challenge in a Rule 50 motion the jury's conclusion that it did, nor did they challenge the sufficiency of the evidence underlying that conclusion.

## C. Reinsurers' Arguments that Guaidó's Government Was Not the Lawfully Constituted Government Are Wrong.

Reinsurers dedicate much of their brief to arguing that Guaidó never became president as a matter of Venezuelan law. Br. at 39-51. As explained above, this line of argument is foreclosed by the recognition doctrine: neither the District Court nor this Court may second-guess the executive's recognition of Guaidó.

45

Nor is it open to Reinsurers argue this issue on appeal. In their response to CITGO's statement of undisputed facts, Reinsurers "admit[ted] the National Assembly appointed Juan Guaidó as Interim President of Venezuela," and—while contesting this fact's relevance and materiality—did not dispute that this appointment occurred pursuant to Article 233 of the Venezuelan Constitution. Dkt. 151 ¶ 43. The District Court accepted this admission as an undisputed fact in determining that Guaidó assumed the presidency pursuant to Article 233. Dkt. 182 at 3 (citing Dkt. 151 ¶ 43).

After the District Court entered partial summary judgment in CITGO's favor, Reinsurers apparently thought better of their admission. When the court ordered briefing eight months later concerning the date Guaidó's presidency began under Venezuelan law (Dkt. 239), Reinsurers argued for the first time that Guaidó *never* became president as a matter of Venezuelan law (Dkt. 244). The court rejected that argument in a ruling from the bench. 12/12/23 Trial Tr. 29:23-30:1 ("Defendants' arguments that Mr. Guaidó simply never became president—though perhaps arguable in a Venezuelan court—are unavailing in this Court, which must abide by the recognition doctrine.").

46

Reinsurers now argue that their briefing on a different issue requested by the District Court—the date Guaidó's presidency commenced under Venezuela's constitution—"[led] inexorably to the conclusion" that there never was a Guaidó government at all, and they seemingly contend that this should have prompted the District Court to "overturn its prior ruling on summary judgment[.]" (Br. at 49). However, Reinsurers never moved for reconsideration of the court's ruling on summary judgment. Reinsurers cannot now seek reversal of the District Court for relying on Reinsurers' own admission and then failing to reconsider its judgment *sua sponte* based on Reinsurers' belated attempt to retract their admission while briefing a different issue. Without moving for reconsideration, it is not enough merely to contradict a prior admission in a brief. Nor can Reinsurers obtain reversal based on a supposed error they themselves invited. *United States v. Bastian*, 770 F.3d 212, 218 (2d Cir. 2014).

The District Court properly concluded that Guaidó's presidency began on January 10, 2019, pursuant to the Venezuelan Constitution. 12/12/23 Trial Tr. 35:19-25. As explained in CITGO's Rule 44.1 submissions, Venezuelan presidential terms begin on January 10th and

47

last for six years. *See* Dkt. 243.2, Constitution of the Republic of Venezuela (English Transl.) Arts. 230 & 231; Dkt. 242, Rule 44.1 Declaration of C. Sarmiento-Sosa ("Sosa II Decl.") ¶¶ 3-4. Because Maduro was elected to complete a presidential term that began January 10, 2013, his term ended on January 10, 2019. Sosa II Decl. ¶ 4. As his term was expiring, Maduro organized a sham election in 2018 from which his main opponents were excluded, and which the National Assembly therefore declared invalid. Dkt. 151 ¶ 39; 12/12/23 Trial Tr. 97:19-99:17. When his term expired, Maduro attempted to remain in office despite his failure to win valid reelection. Sosa II Decl. ¶ 5. This "created a permanent presidential unavailability." *Id.* ¶ 6.

Under the Venezuelan Constitution, when an elected president becomes unavailable to serve prior to his inauguration, "[p]ending election and inauguration of the new President, the President of the National Assembly shall take charge of the Presidency of the Republic." *Id.* ¶ 6 n.2; Dkt. 243.2, Venez. Constitution Art. 233.

Guaidó was the President of the National Assembly when the Venezuelan presidency became vacant on January 10, 2019. Sosa Decl. ¶ 6. By operation of Article 233, he therefore "[took] charge of the

Presidency of the Republic" on that date. *Id*. ¶ 7.[12]

Therefore, the District Court correctly determined that under Venezuelan law, "Mr. Guaidó, as then-president of the National Assembly, took 'charge of the Presidency of the Republic' at least no later than the date that former President Maduro's term expired: January 10, 2019." 12/12/23 Trial Tr. 35:19-23.

## II. THE DISTRICT COURT PROPERLY TOOK JUDICIAL NOTICE OF FACTS FROM RELIABLE SOURCES WHOSE ACCURACY REINSURERS NEVER MEANINGFULLY CHALLENGED.

The District Court's determinations of judicial notice are reviewed for abuse of discretion, *Lewis v. M&T Bank*, No. 21-933, 2022 WL 775758 (2d Cir. Mar. 15, 2022) (citing *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 424 (2d Cir. 2008)), and are subject to harmless error analysis, *In re Boyer*, 328 Fed. App'x 711, 716-17 (2d Cir. 2009). Reinsurers raise three arguments regarding judicial notice: first, that the District Court "inappropriately noticed facts in dispute"; second, that the court "noticed facts that were not relevant"; and third, that the source

---

[12] In briefing this issue, Reinsurers never contradicted this construction of the law. Instead, they reiterated their already-rejected contention that Guaidó never became president at all. Dkt. 236 at 3.

material was insufficiently reliable. None of these arguments has merit. Moreover, Reinsurers fail to articulate any prejudice they allegedly suffered due to any of the noticed facts. This is particularly critical where, as here, CITGO presented extensive fact and expert testimony in support of its motion for summary judgment and at trial concerning the political situation in Venezuela and the events leading to its loss.

### A.  Reinsurers Failed to Raise Any Dispute as to the Accuracy of Any of the Facts at Issue.

Although Reinsurers vaguely allege that that the District Court took notice of multiple "controverted facts," their brief identifies only one. Br. at 55-56. Reinsurers fault the District Court for taking judicial notice that, "[o]n January 23, 2019, Guaidó, as president of the National Assembly, assumed the role of interim president pursuant to the provision of the constitution related to vacancies." Br. at 56. But Reinsurers omit that the court did not take judicial notice of this fact at the summary judgment stage. To the contrary, the court *declined* to take notice of this fact at that juncture. Dkt. 182 at 15 (declining to take notice of paragraph 1 of CITGO's proposed facts, which included the passage at issue). The court's summary judgment order relied instead upon the

statements of the United States executive branch and on Reinsurers' own admission. Dkt. 182 at 3 (citing Reinsurers' admission at Dkt. 151 ¶ 43).

Months later, in the lead-up to trial, CITGO submitted a second request for judicial notice. Dkt. 207. Only then did the court take notice of the fact that Reinsurers now allege was improperly noticed (Dkt. 238)—but that had no bearing on the District Court's earlier summary judgment order, nor did it introduce a new fact into the case, given that the District Court already had determined that Guaidó was the U.S.-recognized Interim President of Venezuela during the events in question.

Reinsurers next argue that it was improper for the District Court to take notice of "the nature and scope of events on the ground in Venezuela," because that was "one of the central controversies in this case." Br. at 57. But the only judicially-noticed fact Reinsurers cite (in a footnote) is that, in Reinsurers' words, "the Venezuelan government" (referring to Maduro's regime) "forcibly prevented a food aid convoy organized by Guaidó supporters from entering the country from Columbia [sic] in February, 2019." *Id.* at n.12. Again, this fact is not in controversy—Reinsurers acknowledge there was a Guaidó-organized food caravan that was prevented from crossing the border by forces loyal

51

to Maduro; CITGO's trial witness, Moises Rendon, testified as much, meaning the fact judicially noticed was confirmed through live, uncontradicted testimony at trial. 12/12/23 Trial Tr. 105:11-18. Reinsurers merely argue that the "food aid was not insurrectionary, nor was preventing illegal entry into Venezuela." Br. at 57. This is irrelevant to whether the fact itself was beyond reasonable dispute and therefore a proper subject of judicial notice. Reinsurers' argument states a legal conclusion that has nothing to do with the noticed fact.

In sum, Reinsurers do not identify a single fact that was an improper subject of judicial notice.

## B. The Facts Noticed Were Relevant and Non-Prejudicial.

Reinsurers argue in passing that the District Court abused its discretion by taking notice of facts that were "plainly prejudicial and irrelevant," but Reinsurers do not identify any such fact.[13] Instead, they vaguely assert that the court "noticed events that took place hundreds of miles away and, in some cases years before" the loss of the Cargo, and

---

[13] Significantly, the District Court denied or modified numerous statements in both of CITGO's judicial notice requests (Dkt. 182, 238), and on Reinsurers' motion, struck an additional one at trial. 12/13/23 Trial Tr. 158:18-161:15.

then cite three pages of the record without any further detail. Br. at 58-59 (citing Dkt. 182 at 15, Dkt. 238 at 3-4). Moreover, beyond a conclusory assertion that these unidentified facts were "plainly prejudicial," Reinsurers do not articulate any specific prejudice. *See id.*

Citing three pages of the record, then vaguely alleging that somewhere in those pages are facts of some nature, that are prejudicial in some way, is insufficient to define an issue for appeal. Neither CITGO nor this Court is required to mine the record on Reinsurers' behalf for instances of nebulous "events" that allegedly took place "hundreds of miles away" or "years before" the events in question.[14] Nor is the Court required to speculate as to what prejudice Reinsurers allegedly suffered. CITGO cannot meaningfully respond to, and the Court cannot meaningfully evaluate, an argument that does not cite any specific fact nor explain how that fact is prejudicial.

---

[14] To the extent Reinsurers claim violence hundreds of miles away is irrelevant, that is plainly incorrect. It is relevant to show that an insurrection was in progress. CITGO was required to show that its loss "arose from … insurrection," not that insurrectionary violence occurred on its chartered vessel.

### C. The State Department Reports, Congressional Research Report, and U.N. Reports Are Proper Subjects of Judicial Notice.

Unable to dispute the accuracy of the facts the District Court judicially noticed, Reinsurers resort to criticism of the sources from which those facts are drawn. Br. at 59-62. In doing so, they fail to cite a single specific fact they were allegedly prejudiced by or explain the nature of the prejudice. This alone is sufficient basis to deny Reinsurers any relief on this issue, but Reinsurers' arguments also fail on the merits.

### 1. State Department Country Reports

"[C]ourts have frequently taken judicial notice of official government reports as being capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *B.T. Produce Co., Inc. v. Robert A. Johnson Sales, Inc.*, 354 F. Supp. 2d 284, 285 n.2 (S.D.N.Y. 2004). For instance, this Court took judicial notice of a State Department Country Report on Human Rights Practices for the fact that the Liberation Tigers of Tamil Eelam were defeated by the Sri Lankan army in May 2009. *Farook v. Holder*, 407 Fed. App'x 545, 547 (2d Cir. 2011). Similarly, this Court took notice of facts in a 2001 State Department Country Report on Human Rights Practices regarding coercive birth control practices in China. *Ren v.*

*Gonzalez*, 164 Fed. App'x 33, 35 n.2 (2d Cir. 2006) ("We take judicial notice of the 2001 Country Report, as the IJ admitted a copy into evidence, it is readily accessible, and its contents are not subject to reasonable dispute."); *see also Dobrota v. I.N.S.*, 195 F.3d 970, 973 (7th Cir. 1999) (taking judicial notice of State Department's Romania Country Report); *Shehu v. Gonzales*, 443 F.3d 435, 437 (5th Cir. 2006) (taking judicial notice of Kosovo Country Report); *Youkhana v. Gonzales*, 460 F.3d 927, 932 (7th Cir. 2007) (taking judicial notice of facts contained in Iraq Country Report).

There is no indication in any of these cases that the courts applied a "relaxed standard" for judicial notice in particular circumstances, as Reinsurers contend (Br. at 60). Nor do these cases support Reinsurers' argument that the courts treated the State Department reports as something akin to admissions against interest made by the government, that could be held against the government in asylum proceedings. *See id.*

Reinsurers argue that country reports can be influenced by "political and diplomatic aims of the State Department." Br. at 60 (citing *Niam v. Ashcroft,* 354 F.3d 652, 658 (7th Cir. 2004)). But both this Circuit

and the Seventh Circuit have found State Department country reports reliable. *See* cases cited *supra* at 55. Moreover, the District Court stressed that it was taking judicial notice of facts not reasonably disputable, not the complete documents, and carefully distinguished between statements it found appropriate for judicial notice and those it did not. Dkt. 183 at 13-15.

### 2. Congressional Research Service Report

The Congressional Research Service ("CRS") is an arm of the U.S. legislative branch that "works exclusively for the United States Congress, providing policy and legal analysis to committees and Members of both the House and Senate." https://loc.gov/crsinfo/ (last visited July 24, 2024). Similar to State Department Country Reports, the court may take judicial notice of facts contained in CRS reports. In *Kareem v. Haspel*, 986 F.3d 859 (D.C. Cir. 2021), for example, the D.C. Circuit took judicial notice of facts regarding the Syrian conflict described in Congressional Research Service reports because they were "generally known and [could] be determined from reliable sources." *Id*. at 866 n. 7. The District Court thus properly took judicial notice of discrete facts contained in the CRS report.

### 3. United Nations Reports

United Nations reports "are published by a governmental entity and are not subject to reasonable dispute, and accordingly, they are appropriate for judicial notice." *Barber v. Nestlé USA, Inc.*, 154 F. Supp. 3d 954, 958 n.1 (C.D. Cal. 2015). Reinsurers criticize the standard of proof applied in the U.N. Reports (Br. at 62), but do not point to a single inaccuracy in those reports.

To the contrary, when responding to CITGO's statement of undisputed facts, Reinsurers admitted that they "do not dispute" the UN report. Dkt. 151 ¶ 61 ("Defendants do not dispute the [State Department and U.N.] reports that are partially quoted in Paragraph 61"). This is because the U.N. Reports are accurate. If Reinsurers could have demonstrated any misstatements of fact in these reports, they would have. Their inability to do so, together with their admissions in response to CITGO's statement of facts, demonstrate that the District Court did not abuse its discretion in taking notice of a limited set of discrete facts drawn from the U.N. Reports.

## III. THE DISTRICT COURT'S JURY INSTRUCTION ON CAUSATION CORRECTLY STATED GOVERNING NEW YORK LAW.

Reinsurers argue the District Court erred in instructing the jury on the "arising from" causation standard in the Policy. They contend that the court instead should have applied a test derived from general marine insurance principles which concern language different from that found in the Policy. Br. at 63-65. As shown below (pages 67-69), Reinsurers expressly withdrew that argument in the District Court and cannot resurrect it on appeal. Furthermore, Reinsurers' argument ignores both the Policy language and the express selection of New York law they agreed to.[15] Reinsurers also ignore the repeated admonition in the cases they do cite that parties are free to adopt other language—as they did here—to deviate from the proximate cause standard sometimes used in maritime cases. Taken to its logical conclusion, Reinsurers' argument would require courts to apply that proximate cause standard to marine cargo insurance without regard to the actual provisions insurers write

---

[15] "This policy shall be governed by and construed in accordance with the laws of the State of New York, United States of America[.]" Dkt. No. 75.1 at 17. Reinsurers effectively ask this Court to replace the contractually agreed-upon choice-of-law clause with one that imports admiralty law into this diversity case, over CITGO's objection.

58

into their policies.  No law supports that proposition and Reinsurers cite none.

Importantly, Reinsurers' argument fails to quote either the operative Policy language or the jury instruction they challenge.  The Institute War Clauses provide:

> This insurance covers . . . **loss** of or damage to the subject-matter insured **caused by**
>
> 1.1 war civil war revolution rebellion **insurrection, or civil strife arising therefrom**, or any hostile act by or against a belligerent power
>
> 1.2 capture **seizure** arrest restraint or detainment, **arising from the risks covered under 1.1. above**, and the consequences thereof or any attempt thereat

Dkt. 75.1 at 17 (emphases added).

Thus, the Policy covers "loss … caused by … a seizure … arising from … insurrection, or civil strife arising therefrom."   The District Court's instruction recognized that this language required two causal judgments:  First, was the loss "caused by" a seizure?  Second, did the seizure "arise from" an insurrection?  12/18/23 Trial Tr. 869:13-18.

The District Court's adherence to the language of the Policy rather than some generalized principle plucked from admiralty law is consistent with controlling New York case law, which Reinsurers have admitted

governs this dispute.  Dkt. 61 ¶ 24.  As New York's highest court has stressed, when interpreting an insurance policy, "[a]ll that matters is the language adopted by the parties to the insurance policy at issue[.]" *Burlington Ins. Co. v. NYC Transit Auth.*, 29 N.Y.3d 313, 324-25 (2017).[16]

New York's courts have spoken very clearly to the causation standards at issue here.  They have stressed that "'[a]rising out of' is not the functional equivalent of 'proximately caused by.'"  *Id.* at 324 (2017). "Caused by" denotes proximate causation.  *See, e.g., id.* at 322.  In this context, "proximate cause" means "a substantial cause of the events that produced the injury"—not the event immediately preceding an injury.

---

[16] In a footnote, Reinsurers argue that the District Court's causation rulings conflict with the Supreme Court's decision in *Great Lakes Insurance v. Raiders Retreat Realty Co.*, 601 U.S. 65 (2024).  They contend *Raiders Retreat* "noted the importance of uniform maritime law given that marine insurance is 'an integral part of virtually every maritime transaction, and maritime commerce is a vital part of the nation's economy.'"  Br. at 67 n.14.  But Reinsurers fail to note the Supreme Court was stressing the importance of *enforcing* contractual choice-of-law provisions.  Restoring what Reinsurers omitted, the full quotation reads:  "Indeed, the uniformity and predictability *resulting from choice-of-law provisions* are especially important for marine insurance contracts given that marine insurance is 'an integral part of virtually every maritime transaction, and maritime commerce is a vital part of the nation's economy.'"  *Raiders Retreat*, 601 U.S. at 75 (emphasis added; citation omitted).  Here, honoring the parties' choice of law requires enforcement of New York's precedents on causation.

*Hain v. Jamison*, 28 N.Y.3d 524, 528-29 (2016). As to the Policy requirement that the loss be "caused by … seizure," the District Court applied exactly this proximate cause standard. 12/18/23 Trial Tr. 869:25-870:2 (instructing jury to determine first whether the seizure "was a substantial factor in bringing about the loss").

The District Court separately instructed the jury concerning the standard applicable in New York law to determine whether the seizure "arose from … insurrection, or civil strife arising therefrom":

> The phrase "arising from" means that there is at least some causal relationship between the injury and the risk for which coverage is provided. It is important to keep in mind that the words "arising from" have broader significance than the words "caused by." Under the law, an event can "arise from" a particular circumstance even if the causal relationship is attenuated. "Arising out of" means originating from, incident to, or having connection with. A seizure may have "arisen from" more than one cause.

12/18/23 Trial Tr. 870:15-24.

This instruction also was entirely proper. In New York law, "arising from" has "a broader significance than the words 'caused by[.]'" *Aetna Cas. & Sur. Co. v. Liberty Mut. Ins. Co.*, 91 A.D.2d 317, 320-21 (4th Dep't 1983) (quoting 6B Appleman, Insurance Law & Practice [rev. ed.], § 4317). It means "originating from, incident to, or having connection

61

with," and requires "only that there be some causal relation between the injury and the risk for which coverage is provided." *Maroney v. N.Y. Cent. Mut. Fire Ins. Co.*, 5 N.Y.3d 467, 472 (2005) (internal citations omitted).[17] New York courts have consistently held that the "arising from" standard requires only "but for" causation, not proximate cause. *XL Specialty Ins. Co. v. Agoglia*, 2009 WL 1227485, at *9-10 (S.D.N.Y. Apr. 30, 2009); *Merritt Env't Consulting Corp. v. Great Divide Ins. Co.*, 2018 WL 6177970, at *6 (E.D.N.Y. Oct. 10, 2018); *Country-Wide Ins. Co. v. Excelsior Ins. Co.*, 147 A.D.3d 407 (2017). As the string of foregoing and footnoted authorities establish, this interpretation is not limited to one case, as Reinsurers imply (Br. at 65); it has been applied repeatedly, as a

---

[17] *Accord Regal Constr. Corp. v. Nat'l Union Fire Ins. Co. of Pittburgh, PA*, 15 N.Y. 3d 34, 38 (2010) (personal injuries "arose out of" Regal's work because "there was a connection between the accident" and the work, even if direct cause of injury was negligence by a different party); *Federal Ins. Co. v. American Home Assur. Co.*, 639 F.3d 557, 568 (2d Cir. 2011) (quoting *Maroney*); *Turner Constr. Co. v. Kemper Ins. Co.*, 198 Fed. Appx. 28, 30 (2d Cir. 2006) ("arising out of" means "originating from, incident to, or having connection with," and "requires only that there be *some* causal relationship") (emphasis in original); *Aetna Cas. Co., supra*, 91 A.D.2d at 320-21 ("arising from" in automobile policy means "incident to, or having connection with").

general principle, in a wide range of insurance cases decided under New York law.[18]

Not surprisingly, Reinsurers fail to cite any positive authority applying New York law interpreting the phrase "arising from" any differently than the District Court instructed. They place great emphasis on only one case: this Court's decision in *Pan Am*. But *Pan Am* did not address the term "arising from"; it determined only that the particular phrase before it—"due to or resulting from"—"refer[red] to the proximate cause of the loss." 505 F.2d at 1006. To make their argument, Reinsurers simply presuppose that *Pan Am* mandates application of a proximate cause standard to *any* and *every* marine insurance policy, regardless of the actual policy language, and regardless of any subsequent developments in New York law. *See* Br. 63-64. *Pan Am* cannot bear that

---

[18] This reading of "arising from" is widely accepted, not limited to New York law. *See, e.g., Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So.2d 528, 533 (Fla. 2005) (requiring "some level of causation greater than coincidence"); *Am. Economy Ins. Co. v. Holabird Root*, 886 N.E.2d 1166, 1172 (Ill. App. 1st Dist. 2008) (requiring only "but for" causation); *Manufacturers Cas. Ins. Co. v. Goodville Mt. Cas. Co.*, 170 A.2d 571, 607-08 (Pa. 1961) (same); *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004) (same); *Looney Ricks Kiss Architects, Inc. v. State Farm Fure & Cas. Co.*, 677 F.3d 250 (5th Cir. 2012) (same under Louisiana law).

63

weight. To the contrary, the *Pan Am* court underscored that the causation standard was *not* immutable, and the contract parties are free to write a more lenient standard if they choose. *Id.* at 1007. That is precisely what Reinsurers did here by using the phrase "arising from" and designating New York law to govern its construction.[19]

Moreover, *Pan Am* involved aircraft insurance, not marine insurance. Therefore, it is nonsense for Reinsurers to contend that *Pan Am* set down a special, universal and immutable standard, different from all other insurance, for marine insurance policies. Marine insurance was not before the *Pan Am* Court.

In short, the New York Court of Appeals has assigned a specific causation standard to the phrase "arising from," and *Pan Am* offers no license to displace that standard by reference to general maritime law. Indeed, because *Pan Am* was decided decades before *Maroney* and its

---

[19]Moreover, the causation analysis in *Pan Am* did not address an insurance policy provision containing two distinct causal standards ("loss caused by . . . seizure arising from . . . insurrection"), such as the one found in Clause 1.2 of CITGO's Policy. Given that every portion of a policy provision must be given full force and effect, *see Cragg v. Allstate Indem Corp.*, 17 N.Y.3d 118, 122 (2011), Reinsurers cannot invoke *Pan Am* to gloss over the distinction between "caused by" and "arising from" language as separately used in CITGO's Policy.

64

progeny, in any conflict between the two decisions, *Maroney's* later-adopted standard—that "arising from" equals "but for" causation"—is controlling.

Reinsurers' other authorities afford them no better help. *Queen Ins. Co. v. Globe & Rutgers Fire Ins. Co.*, 263 U.S. 487 (1924), arose under admiralty jurisdiction. It applied federal maritime law, as it then existed. Therefore, it cannot control the interpretation, by a court sitting in diversity, of a policy governed by New York law. And, like *Pan Am*, it involved different policy language specifically requiring proximate causation. Further, as in *Pan Am*, the Court stressed that actual policy language supersedes supposed "general principles" of causation and "the parties can shape their contract as they like." *Id.* at 492-93.

In the 106-year-old decision in *Bird v. St. Paul Fire & Marine Ins. Co.*, 224 N.Y. 47 (1918), the New York Court of Appeals applied a proximate cause standard to a particular set of facts, but it did not state the policy language it was construing, as *Maroney* and its progeny do. Because *Maroney* is a modern construction of specific "arising from" language by the same New York Court of Appeals, it is controlling. What is notable about *Bird* is that the court freely cited non-marine cases in

support of its judgment. *Id.* at 50-55. This casts serious doubt on Reinsurers' contention that the Court should distinguish the holding in *Maroney*, a non-marine case, because it did not involve a marine cargo policy.

Reinsurers next attempt at some length to relitigate their factual contentions that the loss did not arise from insurrection, but from an alternative cause, a "commercial dispute." Br. 66-68. But this argument—and their evidence—were placed before the jury and rejected.

Finally, as noted at the outset, Reinsurers expressly withdrew the causation argument they now seek to resurrect on appeal. They provide a nearly page-long footnote attempting to disavow that withdrawal. Br. at 66 n.13. Following the third day of trial, Reinsurers' counsel attempted to persuade the District Court to reconsider its earlier formulation of the jury instruction. 12/14/23 Trial Tr. 603:20-607:7. The court was skeptical, noting that Reinsurers' attempt to distinguish the leading New York case, *Maroney*, was not enough; they would need to offer positive New York authority for their proffered interpretation of "arising from." *Id.* 606:9-17, 607:8-20. Reinsurers offered no such authority in open court—having previously failed to do so over some 20

previous months of briefing the issue on summary judgment (Dkt. 149 at 15-16), in pretrial filings (Dkt. 197 at 4-5; Dkt. 236 at 8-12), and in proposed jury instructions (Dkt. 203 at 10-11). The court therefore invited Reinsurers to file a letter before proceedings resumed the next day, instructing them to cite positive authority—"a case that stands for your proposition"—and reminding them of their obligations under Rule 11.[20] 12/14/23 Trial Tr. 607:8-20. Upon that admonition, Reinsurers' counsel stated, "*Your Honor, if I may, we'll withdraw the objections.*" *Id.* 608:11-12.

> Even then, the court replied:

> You need not. I'm happy to withdraw them and will treat them as withdrawn. But if you change your mind, I'm happy to pursue any position that you reasonably can or that you believe that you should in support of your client's interests. I will treat them as withdrawn, but, again, do not hesitate to raise them if it's appropriate in your view in the service of your client's interests. There's no shame in pursuing an argument that should be presented on behalf of your client.

---

[20]Reinsurers complain of the short deadline for such a letter while at trial, but given the long prior briefing history of the issue and the exigency of resolving it while already at trial, the court's direction was entirely reasonable. Moreover, the court frequently gave both parties homework at the end of a trial day, and both parties filed letters on very short deadlines throughout trial. Dkt. 273, 274.

*Id.* 608:13-21. But Reinsurers never changed their position—until they filed this appeal.

Reinsurers now declare they had an "obvious intent" to maintain the objection on appeal. Br. at 66 n.13. This is hardly obvious. Instead, the record demonstrates that Reinsurers' counsel, apparently knowing he could cite no positive authority for Reinsurers' position and reminded by the court of his obligations as an officer of the court, thought better of maintaining the non-colorable objection, and withdrew it.[21]

## CONCLUSION

For the foregoing reasons, Appellee CITGO Petroleum Corporation respectfully submits that the judgment of the District Court should be affirmed.

---

[21]To the extent the Court nevertheless concludes Reinsurers preserved their argument concerning the causation standard, they failed to preserve their contention that "[t]here is no evidence whatsoever of any insurrection that caused the seizure of CITGO's cargo from the vessel," which is based on Reinsurers' assertion that "there was no violence of any kind anywhere near the vessel" and the seizure resulted from a commercial dispute. Br. at 67. After hearing all the evidence, the jury concluded otherwise. Because Reinsurers did not file a motion under F.R. Civ. P. 50(b) to challenge the sufficiency of the evidence, they have not preserved the right to contest its sufficiency on appeal.

Dated:     July 26, 2024

PILLSBURY WINTHROP SHAW
PITTMAN LLP

  /s/ Richard P. Donoghue
Richard P. Donoghue
31 West 52nd Street
New York, NY 10019
(212) 959-1000
richard.donoghue@pillsburylaw.com

David F. Klein
Mark J. Plumer
John P. Chamberlain
Jeffrey W. Mikoni
1200 17th Street, NW
Washington, DC 20036
(202) 663-8000
david.klein@pillsburylaw.com
mark.plumer@pillsburylaw.com
john.chamberlain@pillsburylaw.com
jeffrey.mikoni@pillsburylaw.com

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies pursuant to Fed. R. App. P. 32(g) that the Brief complies with the type-volume limitation of Local Rule 32.1(a)(4) because, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f), this document contains 13,867 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced Century Schoolbook typeface in 14-point size.

 /s/ John P. Chamberlain
John P. Chamberlain
Pillsbury Winthrop Shaw Pittman LLP
1200 17th Street, NW
Washington, DC 20036
(202) 663-8000
john.chamberlain@pillsburylaw.com